# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY KATHRYN BROWN,    )
             )
      Plaintiff,  )
             )
   v.         )  Civil Action No. 06-393
             )  Judge Nora Barry Fischer
CITY OF PITTSBURGH, et al.,   )
             )
      Defendants. )

## OPINION

This action comes before the Court upon Plaintiff, Mary Kathryn Brown's[1] (hereinafter "Brown") Motion for Preliminary Injunction [DE 22], in which Brown challenges the City of Pittsburgh's Ordinance No. 49[2] (hereinafter "Ordinance"), regulating access to health care facilities. Brown seeks this injunction to prohibit the City of Pittsburgh, Pittsburgh City Council, and Luke Ravenstahl, in his official capacity as Mayor of the City of Pittsburgh[3] (hereinafter collectively, "City Defendants"), from enforcing Sections 623.03 and 623.04 of the Ordinance against her.

Upon review of Brown's Motion and Brief [DEs 22 & 23], the City Defendants' response thereto [DE 35], the transcript of the evidentiary hearing held on September 21, 2006 including exhibits presented to the Court, Brown's Proposed Findings of Fact and Conclusions of Law [DEs 50 & 52], the City Defendants' Proposed Findings of Fact and Conclusions of Law [DEs 49 & 51],

---

[1]Brown's counsel is comprised of attorneys from the Alliance Defense Fund ("ADF"), a national legal alliance based in Arizona whose stated purpose is to "aggressively defend religious liberty" and "speak the truth." *See* Alliance Defense Fund, *available at*: http://www.alliancedefensefund.org/about/purpose/Default.aspx. (Last visited January 11, 2008). The ADF has had various roles in many United States Supreme Court cases. *Id.* Since 1994, ADR has provided funding for hundreds of cases and legal projects. *Id.*, *available at:* http://www.alliancedefensefund.org/whatwedo/funding/default.aspx. (Last visited February 21, 2008).

[2]The Ordinance is summarized *infra*.

[3]Mayor Luke Ravenstahl was substituted as a party to this matter on May 22, 2007. The former Mayor Bob O'Connor was initially named as a party to the suit but passed away in September of 2006 after Brown initiated this action. However, at the time the Ordinance was passed in December 2005, Luke Ravenstahl was a member of the Pittsburgh City Council and voted against it.

the transcripts of the City Council meetings leading to the passage of the challenged ordinance,[4] as well as Brown's Supplemental Authorities [DE 64], Defendants' response thereto [DE 65], and the oral argument heard by the Court on December 19, 2007, this Court now addresses Brown's motion.

## I.    Introduction

Brown filed a Motion for Preliminary Injunction on June 28, 2006, seeking to enjoin the City Defendants from enforcing the Ordinance as applied to her. (Docket No. 23, at 1).  She maintains that the Ordinance restricts her ability to protest, an activity in which she has engaged outside various reproductive health facilities in the City of Pittsburgh for a number of years.  *Id.*   Specifically, Brown alleges that the provisions of the Ordinance are unconstitutional as applied to her individual abortion protest activities at entrances to three facilities: Planned Parenthood in downtown Pittsburgh, Allegheny Reproductive Health Center, and Allegheny Women's Center, both in the East Liberty neighborhood of the City of Pittsburgh. (Docket No. 50, at 2 ¶ 7; Exhibits in Support of Plaintiff's Motion for Preliminary Injunction 5-7 (hereafter, "Pls. Exh." )).  These facilities provide medical services to women, including abortions.  The City Defendants filed their Opposition to Brown's Motion on August 3, 2006 [DE 35], and a full evidentiary hearing was held on September 21, 2006 before the Honorable Thomas M. Hardiman [DE 44].  Following the hearing, the parties submitted Proposed Findings of Fact and Conclusions of Law [DEs 50-52].   During a status conference held on May 16, 2007 [DE 54], this Court[5] provided the parties the opportunity to be

---

[4]Public hearings are legislative proceedings. Therefore, this Court may take judicial notice of the recorded transcripts of those proceedings. *See* Fed. R. Civ. P. 201.  A court may take notice of adjudicative facts when they are not subject to reasonable dispute and are either generally known within the court's territorial jurisdiction, or capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned.  Fed. R. Civ. P. 201(b).

[5]On April 6, 2007, this case was reassigned to the undersigned Judge following the elevation of Judge Thomas M. Hardiman to the United States Court of Appeals for the Third Circuit.

reheard by this Court, supplement the record, and/or update their briefs. Both Brown and Defendants initially declined the Court's offer by notice to this Court received on June 1, 2007. Thereafter, during the course of a status and scheduling conference held on November 27, 2007, the Court provided the parties the opportunity to attempt to resolve the matter through the Court's Alternative Dispute Resolution program and/or a consent decree. The parties declined both options. During said conference, Brown requested leave of the Court to supplement authority and to provide argument. Accordingly, argument was held. Upon consideration of the entire record, this Court makes the following Findings of Fact and Conclusions of Law.

## II.     Findings of Fact

### Identification of the Parties

1.      Brown has worked as a Registered Nurse in Pittsburgh for twenty-two years. (Docket No. 50, at 2 ¶ 1).

2.      Because of her experiences as an Emergency Department nurse, along with her religious beliefs, Brown engaged in sidewalk counseling and leafleting outside three medical services facilities: Planned Parenthood in downtown Pittsburgh, Allegheny Reproductive Health Center in East Liberty, and Allegheny Women's Center in East Liberty. There are sidewalks in front of the entrances of all three facilities. (*Id.* at ¶ 7).

3.      Defendant City of Pittsburgh is a municipal corporation designated as a city of the second class within the Commonwealth of Pennsylvania. Defendant Pittsburgh City Council is the legislative body of the City. Defendant Bob O'Connor was the former Mayor of the City prior to his death in September 2006, after which he was dismissed as party from this action. Defendant Luke Ravenstahl is the current Mayor of the City. (Docket No. 49, at 1 ¶¶ 2-4). At the time of the

3

Ordinance's passage, he was a member of the City Council. (Docket No. 49-3, at 1).

**Enactment of the Ordinance**

4.	The Ordinance originated in the Public Safety Services Committee and it was sponsored by Douglas Shields, William Peduto, James Motznik, and Sala Udin. (*See* Appendix A). The law supplements the Pittsburgh Code of Ordinances, Title 6, Conduct Article I: Regulated Rights and Actions, by adding a new chapter, specifically Section 623, "Public Safety at Health Care Facilities." (*See* Appendix A).

5.	At the open hearings held before the Ordinance was enacted, the public commented on the physical violence and verbal harassment that was occurring at these facilities. (*See* Docket No. 49-2, at 12-14, 18, 20-21, 35, 38-39, 43, 49, 53-54, 60; Docket No. 49-3, at 13, 15, 19). City Council accepted comments describing the need for the Ordinance to prevent future harm and provide additional safety to those walking on the city's streets. (Docket No. 49-2, at 12-14, 18, 20-21, 35, 38-39, 43, 49, 53-54, 60).

6.	At the public meetings, the need for a more efficient use of the Pittsburgh City Police was discussed. In the six months prior to December of 2005, the City Police were summoned to the downtown facility on Liberty Avenue twenty-two (22) times. (Docket No. 49-2, at 53; Docket No. 49-3, at 13). In January of 2005, because of city budget problems, the police assignment to the downtown Planned Parenthood was eliminated. (Docket No. 49-2, at 8). Without the support of police supervision, the downtown facility has experienced an increase in problems between protestors and patients. *Id.* Between February and November of 2005, the downtown Planned Parenthood received sixty (60) complaints from patients regarding problematic and often physical confrontations with protestors. (Docket No. 49-3, at 13).

4

7.    In response to concerns of violent confrontations, issues relating to the use of public sidewalks, inefficiency in the deployment of municipal police officers, lack of certainty by citizens and police officers as to proper behavior, and other matters, the City Defendants enacted Ordinance No. 49 on December 23, 2005, by a vote of six to three.[6]  (Docket No. 49, at 2 ¶ 5; Docket No. 49-2, at 62; Docket No. 49-3, at 32).

8.    The challenged provisions of the Ordinance, which became effective on December 30, 2005, provide in their entirety:

### § 623.03 EIGHT-FOOT PERSONAL BUBBLE ZONE

No person shall knowingly approach another person within eight feet (8') of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet (100') from any entrance door to a hospital and/or medical office/clinic.

### § 623.04 FIFTEEN-FOOT BUFFER ZONE

No person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen feet (15') from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic. [7]

---

[6]Prior to the enactment of the Ordinance, the City of Pittsburgh had regulations in place governing permissible conduct on public streets and sidewalks.  The conduct regulated on such premises includes:  posting signs without consent, distributing handbills and samples, soliciting business, noise control, and alcohol or liquor consumption. *See* Pgh. Code of Ordinances, Title 6, Conduct, Art. 1: Regulated Rights and Actions, Ch. 601: Public Order. The City also mandated ordinances regulating public nuisances, damage to property, graffiti, and pay telephones for public safety purposes. *See Id.*, Chs. 615, 616, 620-21.

[7]The entire Ordinance is reproduced in Appendix A.

### § 623.05 Penalty Section

Any person, firm, or corporation who pleads guilty or *nolo contendere*, or is convicted of violating of [sic] this section shall be guilty of a summary offense and punished by a fine of at least fifty dollars ($50.00) for the first offense; a fine of at least one hundred fifty dollars ($150.00) for a second offense within five (5) years; and a fine of three hundred dollars ($300.00) for a third offense within five (5) years.

For fourth and subsequent offenses within five (5) years the fine shall not be less than three hundred dollars ($300.00) and/or imprisonment for not less than three (3) days but not more than thirty (30) days.

No part of the minimum fine may be suspended or discharged, except upon proof and a finding of indigence by the court. Indigent defendants may pay fines imposed under this section by participation in a court designated community service program, crediting the commensurate dollar amount of each hour of community service toward payment of the minimum fine owed.

(Ordinance, Sections 623.03, 623.04, and 623.05) (emphasis in original).

9.     The purpose and intent behind the creation of the Ordinance is set forth in the Ordinance as

follows:

### § 623.01 Intent of Council

The City Council recognizes that access to Health Care Facilities for the purpose of obtaining medical counseling and treatment is important for residents and visitors to the City. The exercise of a person's right to protest or counsel against certain medical procedures is a First Amendment activity that must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and The City of Pittsburgh Bureau of Police has been consistently called upon in at least two locations within the City to mediate disputes between those seeking medical counseling and treatment and those who would counsel against their actions so as to (i) avoid violent confrontations which would lead to criminal charges and (ii) enforce existing City Ordinances which regulate the use of public sidewalks and other conduct; such services require a dedicated and indefinite appropriation of policing services, which is being

provided to the neglect of the law enforcement needs of the Zones in which these facilities exist. [8]

The City seeks a more efficient and wide deployment of its services which will help reduce the risk of violence and provide unobstructed access to Health Care Facilities by setting clear guidelines for activity in the immediate vicinity of the entrances to Health Care Facilities.

The Council finds that the limited buffer and bubble zones outside the Health Care Facilities established by this Ordinance will ensure that patients have unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired.

(Ordinance, Section 623.01).

10.    Prior to enacting Ordinance No. 49, the Pittsburgh City Council heard public comment on the proposed bill on December 7, 2005 and December 13, 2005. During these hearings, all members of the public were permitted to comment on the pending legislation. (Docket No. 49, at 2 ¶ 6). Plaintiff Brown was one of the many people who appeared and commented regarding the proposed legislation. (*Id.* at ¶ 7). Brown stated that she is not protesting; she stands on the sidewalks to "offer distraught women the truth." (Docket No. 49-2, at 5). She further commented that she believes the patients of these facilities are being denied information about the risks and benefits of abortion. (*Id.*). Brown claimed that she goes out to protest to provide the information these patients need in order to make an informed decision, and that the Ordinance prevents her from doing so. (*Id.* at 5-6).

---

[8]The "Zones" of which the Ordinance speaks are located in downtown Pittsburgh and the neighborhood of East Liberty. These areas are known for having a high volume of violent criminal activity. *See Crime in the United States, 2006*, U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, *available at*: http://www.fbi.gov/ucr/cius2006/data/table_08_pa.html. (Last visited February 21, 2008). The Plaintiff has provided the Court with exhibits in support of her motion for a preliminary injunction which display the facilities at issue and the surrounding zones. However, since those photographs were taken in 2006, the areas have changed. Therefore, the Court has taken a view of these areas pursuant to its inherent power to "observe places or objects that are material to litigation but which cannot feasibly be brought, or satisfactorily reproduced, within the courtroom." 2 McCORMICK ON EVID. §219 (6th ed.). "While statutes or court rules concerning views are in effect in nearly all states, it is frequently said that even without express statutory authorization there is an inherent power in the trial judge...in a judge-tried case, to take a view personally." *Id.* (citing *Bobrick v. Taylor*, 467 P.2d 822 (Colo. 1970)); *see also United States v. Culpepper*, 834 F.2d 879 (10th Cir. 1987).

## Plaintiff's Activities

11.     During the past fifteen years, Brown has spent hundreds of hours outside abortion facilities because she believes that if she does not go to these facilities "precious lives will be lost."  (Docket No. 50, at 3 ¶ 13).

12.     Brown goes out in front of abortion clinics from 7 a.m. until either 10 or 11 a.m., depending on her schedule for that particular day.  She chooses that time because that is when she believes women are getting abortions.  (*Id.* at ¶ 15-16).

13.     Brown claims she has never trespassed or blocked vehicular or pedestrian ingress or egress to an abortion facility.  Brown has never engaged in shoving, kicking, pushing, or elbowing of patients or anyone else outside abortion facilities.  (*Id.* at ¶ 19).

14.     When engaged in such speech activities, Brown stands on the sidewalk to the side of the entrance to abortion facilities, or she walks alongside a woman who is walking on the sidewalk in the direction of an abortion facility, in order to hand said woman a leaflet and/or have a conversation. (*Id.* at ¶ 20) (*See* Pls. Exh. 5-7[9]).

15.     Brown speaks to women about the physical dangers of abortion, discusses alternatives to abortion, and provides referrals for assistance with medical, physical, emotional, and spiritual needs. (*Id.* at ¶ 21).

---

[9]Plaintiff's Exhibit 5 displays the location of Planned Parenthood in downtown Pittsburgh.  Plaintiff's Exhibit 6 displays the Allegheny Women's Center in the Consad building in East Liberty.  Plaintiff's Exhibit 7 displays the Allegheny Reproductive Health Center in East Liberty.  These three exhibits show the various businesses around each facility, the length and width of the sidewalks, and the various viewpoints when standing in and out of the various zones at the time said photos were taken in 2006, all of which is described in more detail *infra*.  A recent visit by the Court to these sites demonstrates some changes in each area; however, said changes are not sufficient to disregard the photographs. *See* 2 McCormick on Evid. § 219, *supra* note 8.

16.     Brown claims that she does not yell out to individuals or resort to a sound device because she believes that these methods eliminate any interest in her message by her intended audience.  (*Id.* at ¶ 22).

17.     Brown claims that throughout the years in which she has engaged in such speech activities, some women have continued their pregnancies as a result of her efforts.  (*Id.* at 4 ¶ 23).

### Brown's Testimony at the September 21, 2006 Evidentiary Hearing

18.     Brown testified that she does not understand what much of the Ordinance means in the context of her speech, including what subject matter the Ordinance prohibits, what conduct or words constitute "consent," from whom she must obtain "consent," and whether the "no approach" prohibition applies to all individuals or just to individuals that intend to enter a facility where abortions may be performed.  Brown maintains that she does not know what is required under the Ordinance in order to obtain consent.  Furthermore, Brown states that she does not know whether she is prohibited from taking a step or even leaning toward someone to hand them some literature. (Transcript of Evidentiary & Preliminary Injunction Hearing held on September 21, 2006, at 44:13-23 (hereafter, "Trans. I.")).

19.     Brown maintains that she does not know whether consent is given by a woman looking at her, stopping to talk or listen, or accepting her literature.  Moreover, Brown does not know how to obtain consent when there are two people walking together, whether she needs consent from one or both, or what she can do regarding her approach within eight feet if she obtains consent from one but not the other.  (Trans. I, at 44:24, 45: 1, 4-7, 8-25).

## Brown's Reason for Bringing this Lawsuit

20.     Brown has filed this lawsuit, including a request for injunctive relief, against the City

Defendants asserting that Defendant City's application of Ordinance No. 49 is unconstitutional as

applied to her under both the First and Fourteenth Amendments of the United States Constitution [10]

and the Pennsylvania Religious Freedom Protection Act, 71 PA. CONS. STAT. §§ 2401-2407

("RFPA").[11]  She does not raise a claim of facial invalidity[12] of Ordinance No. 49 within her motion

seeking injunctive relief (Docket No. 23, at 1).  However, she has pled a claim of facial invalidity

in her Verified Complaint. (Docket No. 1, at 7 ¶ 43).

21.     Brown claims, *inter alia*, that with respect to the eight-foot floating bubble zone established

by the Ordinance, she must run out into the street in order to "walk along side and speak with

people."  (Docket No. 50, at 11 ¶ 108).  Whether or not Brown is forced into the street depends on

where she is protesting.  For example, the sidewalk in front of the downtown facility of Planned

Parenthood is shorter in width than the sidewalks around the facilities in East Liberty. (*See* Pls. Exh.

5).[13]

---

[10]The First Amendment provides: "Congress shall make no law abridging the freedom of speech."  U.S. CONST. amend. I.  The Fourteenth Amendment incorporated this limitation applicable to the States,  *see Gitlow v. New York*, 268 U.S. 652 (1925), and to their political subdivisions,  *see Lovell v. City of Griffin*, 303 U.S. 444 (1938).

[11]The RFPA provides that "an agency shall not substantially burden a person's free exercise of religion, including any burden which results from a rule of general applicability, unless the agency proves, by a preponderance of the evidence that the burden is (1) [i]n furtherance of a compelling interest of the agency, and is (2) [t]he least restrictive means of furthering the compelling interest."  *Combs v. Homer Ctr. Sch. Dist.*, Civil Action  No. 04-1599, 2005 U.S. Dist. LEXIS 32007, at *30 (W.D. Pa. Dec. 8, 2005) (quoting 71 PA. CONS. STAT. § 2404) (2007).

[12]A facial challenge to a regulation limiting expression lies whenever a law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.  *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759 (1988).

[13] This Court has taken a view of these locations and notes that they have changed to some degree since the photographs contained in the Plaintiff's Exhibits were taken.  *See* 2 MCCORMICK ON EVID. § 219, *supra* note 8.

## First Enforcement of the Ordinance against Brown

22.     On January 28, 2006, while Brown was engaging in speech activities at the downtown Planned Parenthood facility, Officer Timothy Alexander of the Pittsburgh Bureau of Police drove up to Planned Parenthood in a marked Pittsburgh police car with lights flashing and sirens on. City Police were dispatched to the scene by 911 operators after the security officer at the facility placed a call for assistance because Brown was allegedly violating the Ordinance. (Docket No. 49, at 6 ¶ 31; Docket No. 50, at 5 ¶¶ 41-43).

23.     Officer Alexander has over fifteen years of experience as a Pittsburgh Police Officer. During his service to the City, he spent many hours observing protesters at various locations, including outside medical services clinics. (Docket No. 49, at 6 ¶ 35).

24.     Upon arrival at the scene, Officer Alexander, in uniform, witnessed protesters inside the fifteen foot buffer zone and noted that they dispersed upon his arrival. Subsequently, he went inside the abortion facility for approximately ten minutes to inquire as to the reason for the call. (Docket No. 49, at 7 ¶¶ 36-37).

25.     As Officer Alexander came back outside, a guard at the abortion facility held the door open from inside and pointed Brown out to Officer Alexander. Officer Alexander spoke with various persons outside the clinic; he advised all of the protesters of the law and their need to comply therewith. (Docket No. 50, at 6 ¶ 44; Docket No. 49, at 7 ¶¶ 37-39).

26.     When Officer Alexander approached Brown, she told him that she did not want any trouble. Ms. Brown informed him that she needed clarification about the Ordinance because she heard conflicting information from the facility employees. (Docket No. 50, at 6 ¶ 45).

11

27.     In seeking to force Brown to comply with the Ordinance,  Officer Alexander told her that in order to obtain consent she must hear the words:  "I consent to you speaking to me about abortion."  (Trans. I, at 45:1-3).

28.     Officer Alexander advised Brown that she is not allowed to do anything within fifteen feet of the entrance of the abortion facility, and that she could not stand in the fifteen-foot buffer zone or be there at all.  (Docket No. 50, at 6 ¶¶ 46-47).

29.     Officer Alexander also stated that he did not want Brown to chase people down the street.  (*Id.* at ¶ 48).

30.     According to Brown, she specifically asked him if she could distribute anti-pornography literature.  Officer Alexander asked Brown if he could see what she was handing out and Brown handed Officer Alexander a copy of the literature.  (Trans. I, at 37:8-14; *see also* Pls. Exh. 3).

31.     According to Brown, Officer Alexander stated that Brown could hand the literature out in front of a pornography shop. However, Officer Alexander took the leaflets with him when he left.  (Trans. I, at 37:9-25, 40:22-25).  Officer Alexander does not recount these facts in the same fashion; in particular, he did not recall Brown handing him the flyers (Pls. Exh. 2 and 3) that day. (Trans. I, at 78:6-24).  According to the Officer, he stated that anyone could hand out literature of any kind so long as doing so complied with the Ordinance.  (*Id.* at 78:25, 79:1-3).  The Officer stated that he did not closely examine or read the contents of any leaflet nor did he intentionally prohibit distribution of one type of literature in lieu of another type.  (*Id.* at p. 80: 2-23).

32.     A pornography shop is located within the restricted one hundred-foot zone from the entrance door to Planned Parenthood on Liberty Avenue.  (Docket. No. 50, at 6 ¶ 54; Pls. Exh. 5).

33.     Officer Alexander told Brown that because there is an Ordinance now, he has to enforce it. (*Id.* at ¶ 55).  According to Brown, Officer Alexander ordered:  "Don't make me have to come back here again."  (*Id.* at ¶ 56).  However, Officer Alexander does not recall making that statement. (Trans. I, at 75:1-4, 11-13, 80:2-6, 21-23).  He did not arrest or cite her for violating the Ordinance. (Docket. No. 49, at 8 ¶ 48-49).  Indeed, Officer Alexander did not recall speaking with Brown specifically on the day he was called out to the clinic.  (Trans. I, at 75:14-17, 80:7-10).

34.     Brown claims that she understood Officer Alexander's warning to mean that she would be cited for violating the Ordinance if she engaged in sidewalk counseling and leafleting opposing abortion in the restricted areas outside abortion facilities.  (Docket No. 50, at 7 ¶ 58).

35.     Under the Ordinance, Brown understands that she is subject to arrest, detention, fine, and punishment.  (*Id.* at ¶ 59).

36.     Brown complied with Officer Alexander's orders and stopped engaging in sidewalk counseling and leafleting opposing abortion in the restricted areas.  (*Id.* at ¶ 60).

37.     According to Officer Alexander, it is common practice in the department that an officer would have to personally witness a violation before he would enforce an ordinance.  (*Id.* at ¶ 62; Trans. I, at 56:18, 57:9).

38.     Officer Alexander testified that under the Ordinance, someone within the one hundred-foot zone would not have to obtain permission from Brown to approach in order to speak to Brown.  A person would only have to obtain permission from the person they are approaching in order to speak with him or her within a certain distance. (Docket. No. 50, at 7 ¶ 64; Trans. I, at 67:8-11).

39.     Officer Alexander testified that one way for Brown to receive consent under the Ordinance would be to state the following:  "I'm an activist, can I speak to you."  (Trans. I, at 67:19-21).

13

## Additional Incidents of Enforcement or Lack of Enforcement

40.     According to Brown, following the enactment of the Ordinance, employees and escorts at the health facilities have opposed Brown's attempts to engage in related speech.[14] (Docket No. 50, at 8, ¶ 70).

41.     The clinics employ staff members and escorts to assist patients to and from the facilities. Neither clinic staff nor escorts are employees or agents of the City. (Docket No. 49, at 10 ¶¶ 64-65; *Id.* at 11 ¶¶ 79-80).

42.     According to Brown, these escorts run between her and the women with whom she attempts to speak outside the facilities.  (Docket No. 50, at 8 ¶80).  In addition, escorts follow Brown around with a camera and approach within one foot of her to take a picture in her face. (*Id.* at 9 ¶ 80).

43.     Health facility employees instruct women on the street waiting to enter the clinics by stating: "Back up eight feet." Brown contends that these directives frustrate her attempt to obtain consent from the waiting women.  (*Id.* at ¶ 81).

44.     Brown also contends that the City of Pittsburgh and its Bureau of Police have not prohibited facility employees from engaging in speech activities in favor of abortion, or have not otherwise enforced the Ordinance against the employees.  (*Id.* at ¶ 82).   However, the police have not witnessed these events involving the facilities' employees nor were they called to the scene by the protestors or the facilities involved.  (Docket No. 49, at 9 ¶55-56; at 10 ¶¶ 66-68).

---

[14]Brown has requested injunctive relief claiming that Ordinance was enforced by the City police officers  in a way that violated her First Amendment rights.  She has also alleged that the facility employees and escorts have sought to enforce the Ordinance against her.  Yet, Brown has not named as a party any of these individuals who serve as facility employees and escorts.  A defendant may move to dismiss an action for a plaintiff's failure to join an indispensable party under Rule 19. Fed. R. Civ. P. 12(b)(7).  A federal district court, at its discretion, may also dismiss an action for failure to join an indispensable party.  *Id.*; *see also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1967). Thus, there could be argument for dismissal based on the lack of indispensable parties.  However, there is no motion to dismiss on this basis presently before the Court.

45. According to Brown, on Saturdays when an allegedly high number of abortions occur, two to four health facility escorts stand at each end of the sidewalk at the start of the restricted one hundred foot zone from entrance doors, and another escort stands in the restricted fifteen foot zone near the entrance. (Docket No. 50, at 9 ¶ 84).

46. Brown states that facility escorts stand within the fifteen foot zone and scream at Brown and call her a liar and tell her that she does not know what she is talking about with respect to the subject matter of Brown's speech. Moreover, the escorts proclaim that abortion is not dangerous for women, that Brown has no right to tell women that it is dangerous, and tell Brown to back off. When Brown is within the restricted one hundred foot zone, yet outside the fifteen foot buffer zone, abortion facility escorts yell: "Back up, back up," even though she is standing in place waiting for a woman to walk by or is walking alongside a woman who has appeared to consent to Brown approaching within eight feet of her. (*Id.* at ¶¶ 85, 88, 90).

47. Because the facility escorts surround women in the restricted areas and walk them into the abortion facility, Brown claims that she has been prevented from getting close enough to obtain consent to approach the women. (*Id.* at ¶ 88).

48. On numerous occasions, facility escorts have allegedly forbidden Brown to speak to women entering the facility. Facility escorts allegedly interfered by telling Brown to back up, grabbing literature from the hands of women who had willingly accepted it as well as from Brown herself, and otherwise interfering with women who consented to speak with Brown. (*Id.* at ¶ 89).

49. Facility escorts tell the women to ignore Brown, that she is lying, and that Brown is not there to help them. According to Brown, even when women declined to proceed with medical services,

15

the escorts physically turned the women around and forced them into the clinic. (*Id.* at 9 ¶ 90, at 10 ¶ 91; Trans. I, at 26:21-25).

50. Facility escorts have never asked Brown or any women at the facilities for permission to approach before they do so. (Docket No. 50, at 10 ¶ 92; Trans. I, at 27:14-24).

51. Brown contends that the police have not enforced the Ordinance against the clinic workers at these times when they are engaging in these activities. However, the police have not witnessed these events nor were they called to the scene. (Docket No. 50, at 10 ¶ 93; Docket No. 49, at 9 ¶¶ 55-56, at 10 ¶¶ 66-67).

52. Brown claims that the threat of arrest, detention, fine, and punishment for violating the Ordinance has caused her to be deterred and chilled in the exercise of her speech. (Docket No. 50, at 10 ¶ 94).

53. Prior to the enactment of the Ordinance, within what is now the one hundred foot zone, Brown would approach women, walk along side them, offer them literature, explain the dangers of abortion, and offer help. (*Id.* at ¶ 95).

54. Brown chose this type of method because she believes it is the most effective. She claims that this method fosters a close, personal, loving, compassionate, and empathetic relationship with the women she addresses. Brown would also stand within what is now the fifteen foot zone and would be able to speak with women coming from all directions. Brown would approach them and offer them literature, explain the dangers of abortion, offer them help, assistance, and alternatives. Brown contends that she would never yell, use amplification, block, push, shove, or engage in other violent behavior. (*Id.* at ¶¶ 96-100).

16

55.     Under the Ordinance, if consent is not first obtained by Brown, the distance between Brown and those whom she wants to approach in order to counsel individuals and hand out leaflets is limited. (*Id.* at ¶ 101).

56.     From outside the restricted areas, Brown states that she would attempt to determine which individuals intend to enter the health facility based on physical characteristics such as sex, age, and dress. (*Id.* at ¶ 103).

57.     Outside the restricted areas, Brown claims that she does not know whether an individual or couple will enter a facility, a neighboring business, or simply pass by. (*Id.* at 11 ¶ 104).

58.     Brown stated that, on numerous occasions, she would misjudge whether an individual or couple intended to enter a facility and thus would lose the opportunity to engage in speech with them because they had entered the restricted area. (*Id.* at ¶ 105).

59.     Brown has seen people whom she did not think were going into the clinic until they entered the fifteen foot zone; then, she was unable to speak with them. (*Id.* at ¶ 106).

60.     Brown has also spoken to those whom she thought were going into the clinic and they did not. (*Id.* at ¶ 107).

61.     Because people rarely walk on the edge of a sidewalk, Brown claims that the eight foot bubble zone in the one hundred foot restricted area forces her into the street in order to walk alongside and speak with people, which she cannot do for her own safety reasons. (*Id.* at ¶ 108).

62.     Brown claims that the eight foot bubble zone limits her from speaking with people, as she has for fifteen years, as they walk through the entire one hundred foot restricted area. (*Id.* at ¶ 109).

63.     Brown contends that she is now limited in her ability to speak with women when attempting to comply with the eight foot floating zone. (*Id.* at ¶ 110).

64.     Attempting to maintain the eight foot zone forces Brown to either: (1) try and run backwards so that she is in front of a woman with whom she is trying to speak and make eye contact while also trying to avoid trees, garbage cans, poles, electric boxes, or pedestrians; (2) run alongside which causes her to be pushed into the street; or (3) run behind women with two or three escorts in between and trying to make herself heard over the traffic, noise, and the pedestrians.  (*Id.* at ¶ 111).

65.     Brown claims that she is also unable to distribute flyers while attempting to maintain the eight foot separation.  (*Id.* at ¶ 112).  Brown faces difficulty in getting close enough to the women to offer literature, especially as she avoids hitting objects.  (*Id.* at ¶ 113).  In the one or two seconds as people walk by, since she cannot approach anyone, Brown claims she is unable to hand out leaflets.  (*Id.* at ¶ 114).  When Brown is passing out leaflets and standing in place to comply with the "no approach" prohibition, she claims that no one has ever approached her to take a leaflet from her.  (*Id.* at ¶ 115).  Most people do not walk right next to Brown, but rather move several feet away, which makes it impossible to hand them a leaflet without approaching them.  (*Id.* at 12 ¶ 115-116).

66.     When engaged in sidewalk counseling and leafleting, Brown chooses to speak in a normal conversational tone.  (*Id.* at 13 ¶ 128).

67.     During the week days, buses go by almost continuously early in the morning until 9:30 or10:00 a.m., at which time the frequency of the buses somewhat lessens, but the bus traffic does not stop.  (*Id.* at ¶ 131).  However, the bus traffic on Saturdays, when Brown claims a lot of women go to the clinic, is considerably less.[15]  (Pls. Exh. 8).

68.     There are also many pedestrians early in the morning. (*Id.* at ¶ 132).

---

[15]Plaintiff's Exhibit 8 provided the Court with a DVD of the clinic locations, evidencing the noise at the various facilities when the DVD was made in 2006.  The Court notes recent cutbacks by Pittsburgh's Port Authority have in all likelihood reduced any noise. *See* Joe Grata, *Port Authority transit cutbacks are biggest in history,* Pittsburgh Post-Gazette, January 4, 2007, *available at*: http://www.post-gazette.com/pg/07004/751189-147.stm.  (Last visited February 21, 2008).

69. At eight feet away, Brown contends that it is difficult for her to speak with individuals entering the facilities and thus she is forced to yell. The women are not able to hear her over the background noise even if she tries yelling. (*Id.* at ¶ 134).

70. Brown chooses not to use any amplification or yelling because she believes, based on her experiences, that it is not helpful. In her view, it is not conducive to reaching women with her message and she believes it scares them and turns them off to her message. (*Id.* at ¶ 135).

71. Because the Ordinance allegedly limits Brown's ability to speak to individuals in the restricted areas, she asserts that she must either yell at people from a distance of eight feet or speak personally for the one or two seconds as people pass her while she stands still to comply with the "no approach" prohibition. (*Id.* at ¶ 136). Under the Ordinance, she may stand on the sidewalk and speak to people as they walk by. (Ordinance; Docket No. 49, at 14 ¶ 100).

72. The Ordinance limits her from peacefully speaking to women, both outside and entering these facilities, by requiring her to stay outside the fifteen foot buffer zone and the eight foot bubble zone around a moving individual. (Docket No. 50, at 14 ¶ 141).

**Facts Particular to Planned Parenthood in Downtown Pittsburgh**

73. The sidewalk in front of Planned Parenthood is approximately 12 to 13 feet wide. (*Id.* at ¶ 142; Pls. Exh. 5). The Planned Parenthood facility is located at 933 Liberty Avenue, Pittsburgh, PA, 15222.

74. The fifteen foot fixed zone extends several feet into the street. (*Id.* at ¶ 143; Pls. Exh. 5-5).

75.    Within the one hundred foot zone on the same side of the street as Planned Parenthood, there are several businesses abutting the sidewalk, including a museum, a bar/nightclub, two restaurants, a theater, and a pornography store.[16]  (*Id.* at ¶ 144; Pls. Exh. 5).

76.    The one hundred foot zone across the street from Planned Parenthood includes the entire street and a portion of the sidewalk which abuts a deli and another street.  (*Id.* at ¶ 145; Pls. Exh. 5).

77.    Because these health facilities are located along busy downtown streets, Brown claims that she cannot be heard at a normal conversational tone when standing at a distance of eight feet from individuals or fifteen feet from any facility entrance due to the background noise from buses and other vehicles, commercial activity, and pedestrians in the area.  (*Id.* at ¶ 146; Pls. Exh. 5).

78.    Brown contends that it is busier and noisier, due to bus and pedestrian traffic, between 7:00 and 8:00 a.m., which she claims is when most of the women are going into the clinic and when she is present.  (*Id.* at 15 ¶ 147; Pls. Exh.5 and 8).

## **Facts Particular to Allegheny Reproductive Health Center in East Liberty** [17]

79.    Allegheny Reproductive Health Center is located at 200 North Highland Avenue, Pittsburgh, PA 15206.  Within the one hundred foot zone on the same side of the street as the clinic are a child day care center and a Salvation Army center.  (*Id.* at ¶ 150; Pls. Exh. 7).

---

[16] The businesses around the Planned Parenthood facility remain the same since the incidents at issue, however, the museum has been replaced by an art gallery.  The sidewalk and streets are also unchanged.  Parking is permitted on Liberty Avenue in front of the facility except in between 7 a.m. - 9 p.m. and 4 p.m. - 6 p.m. on weekdays.  *See* 2 MCCORMICK ON EVID. § 219, *supra* note 8.

[17] Pittsburgh's East Liberty neighborhood is generally considered a high crime area.  *See* Mike Rosenwald, *Perceiving is believing: a major obstacle to the renewal of East Liberty has been its dangerous reputation*, Pittsburgh Post-Gazette, May 25, 2000, *available at*: http://www.post-gazette.com/businessnews/20000525elib3.asp (Last visited February 21, 2008); *City Neighborhoods, Part One: Pittsburgh neighborhood crime statistics*, Pittsburgh Post-Gazette, July 30, 2003, *available at*: http://www.post-gazette.com/neigh_city/20030730crimedatapart1p9.asp. (Last visited February 21, 2008); *City Neighborhoods, Part Two: Pittsburgh neighborhood crime statistics*, Pittsburgh Post-Gazette, July 30, 2003, *available at*: http://www.post-gazette.com/neigh_city/20030730crimedatapart2p9.asp. (Last visited February 21, 2008).

80.     The one hundred foot zone includes the entire street, the sidewalk, and several businesses abutting the sidewalk, such as a bar/lounge, an American Legion, a barber shop, and a clothes shop. [18] (*Id.* at ¶ 151; Pls. Exh. 7).

81.     Public parking is permitted within the one hundred foot zone along the side of the street of the facility.  (*Id.* at ¶ 152; Pls. Exh. 7).

82.     Prior to the Ordinance, Brown would often speak to women who have lined up, according to clinic procedure, outside the facility waiting for an abortion.   Brown would walk up to them and offer them literature, talk to them, and offer them help.  (*Id.* at ¶ 153-54).

83     On or about June 15, 2006, Brown stood outside the fifteen foot restricted area at this facility to engage in sidewalk counseling and leafleting.  (*Id.* at 16 ¶ 158).  Brown spoke with a young woman (about fourteen years old) who was standing outside the abortion facility waiting to be admitted for an abortion.  (*Id.* at ¶ 159).

84.     Brown perceived that the young woman willingly listened to her speak about the physical dangers of abortion as well as the help that was available to her.  (*Id.* at ¶ 160).  When the young woman's boyfriend said, "Babe, we don't want to hear this," the young woman and her boyfriend proceeded toward the entrance of the medical services facility.  (*Id.* at ¶ 161).  Neither was employed by or acting under the authority of the City.  (Docket No. 49, at 9 ¶ 57).

85.     City police were neither present nor called to the scene of this encounter.  (*Id.* at ¶ 55-56).

---

[18] The businesses around Allegheny Reproductive Health center remain the same since the instant action was commenced.  The building located at 200 North Highland Avenue is empty except for the clinic.  The street directly in front of the facility is currently under construction; one lane is closed for construction.  *See* 2 McCormick on Evid. §219, *supra* note 8.

86.     The noise volume represented on the video (Pls. Exh. 8), which was taken at around noon at Allegheny Reproductive clinic, was at a time of the day when less noise was occurring than when Brown is outside the clinic.  (Docket No. 50, at 16 ¶ 164).

87.     There is more traffic early in the morning with people going to work between 7:00 and 9:00 a.m., which is also when Brown believes that most women are going for abortions and when Brown is out at the clinic.[19]  (*Id.* at ¶ 165).

88.     Brown testified that during the first week of September of 2006 she was again standing in front of Allegheny Reproductive Health Center outside the fifteen foot zone and tried to hand a woman literature and speak to her.  (*Id.* at ¶ 167).

89.     A clinic escort who was standing inside the fifteen foot zone allegedly hit Brown's hand when she was attempting to give the flyer to the woman, and the escort screamed in Brown's face that she had to back up and get away.  (*Id.* at 17 ¶ 168).

90.     Brown claims that the escort then put her arm around the woman who was heading towards the clinic entrance and told her to ignore Brown.  (*Id.* at ¶ 169).

91.     It is contended that a police officer, not identified by Brown, was present but did not enforce the Ordinance's consent and distance requirements against the clinic escorts.  (*Id.* at ¶  170).  However, the officer told Brown that he had not witnessed the event.  (Docket No. 49, at 11 ¶ 74).  In addition, the officer told Brown that if he observed her approaching women walking down the street again, then he would arrest her.  (Docket No. 50, at 17 ¶ 171).

92.     Brown contends that the City of Pittsburgh and the Pittsburgh Bureau of Police do not prohibit the facility escorts from engaging in "oral protest" in favor of abortion, and otherwise fail

---

[19] The Court notes that this allegation by Brown is contradicted by her previous claim that a high number of abortions occur on Saturdays.  *See* page 15 *supra* at ¶ 45.

to enforce the Ordinance against the escorts.  (Docket No. 50, at 8 ¶ 79).   Once again, the police

did not personally witness this event involving Brown and the facility escorts.  (Docket No. 49, at

11 ¶ 74).

### Facts Particular to Allegheny Women's Center in the Consad Building in East Liberty

93.     The Allegheny Women's Center is located on the second floor of the Consad building located

at 121 North Highland Avenue, Pittsburgh, PA 15206.  Other businesses are located within the

Consad building.  (Docket No. 50, at 17 ¶ 172-73; Pls. Exh. 6).

94.     The sidewalk in front of Allegheny Women's Health Center is approximately ten feet wide.

(*Id.* at ¶ 174; Pls. Exh. 6).

95.     The fifteen foot zone extends five feet out into the street.  Within the fifteen foot zone there

is a pizza shop that is located next door to the clinic.  Cars park within the five feet that extends into

the street. (*Id.* at ¶ 175-77; Pls. Exh. 6).

96.     Many businesses are within the one hundred foot zone on the same side of the street as the

clinic, including a pizza shop, an insurance store, and a check-cashing store.[20]  (*Id.* at ¶ 178).

97.     The one hundred foot zone also includes the entire street, the sidewalk across the street, and

several businesses abutting the sidewalk such as a fitness center, a fast food restaurant, and an

American Legion.  (*Id.* at ¶ 179; Pls. Exh. 6).

### General Findings

98.     Throughout the entirety of Brown's sworn testimony, including her multiple affidavits and

her testimony given on September 21, 2006, Brown has not presented any evidence that the noise

---

[20] The businesses, street, and sidewalk around the Allegheny Women's Center remain the same.  One hour parking is permitted on the street in front of the Consad building between 8 a.m. and 6 p.m.  *See* 2 MCCORMICK ON EVID. §219, *supra* note 8.

level at the two East Liberty facilities would impede her ability to deliver her message within the parameters of the Ordinance. Therefore, the only issue regarding noise relates to the noise levels at the downtown medical service facility. The noise downtown is created by routine traffic noises, buses, cars and pedestrians. (*See* Pls. Exh. 8). The City Defendants contend that the City does not create or control the level of street noises as to vehicle and pedestrian traffic.[21] (Docket No. 49, at 13 ¶ 91-95).

99. Brown has produced evidence of only two instances where the City has been involved in the enforcement of the Ordinance against her. (Docket No. 50, at 5 ¶¶ 41-43; at 8 ¶¶ 76-77). However, the parties dispute the factual basis of these incidents. (Docket No. 49, at 7 ¶¶ 39-43; at 10 ¶¶ 66-68).

100. At the time of the incidents alleged by Brown, the Pittsburgh City Police Officers had little or no training with regard to the Ordinance. (Transcript of Oral Argument held on December 19, 2007, at 17:9-15 (hereinafter, "Trans. II" )). The officers patrolling the zones, where the health facilities at issue are located, were told by their commanding officer to memorize the Ordinance and its terms. (*Id.*). At the time of the incidents of which Brown complains, the City Police Officers had not yet received formal training from the Pittsburgh City Law Department. (*Id.*).

101. Under the Ordinance, Brown is not prohibited from handing out leaflets, carrying signs, or speaking to her intended audiences. The Ordinance does not place restrictions on the number, size, text, or content of signs. (Docket No. 49, at 14 ¶¶ 98-99).

---

[21] The City does have a noise ordinance that controls the level of excessive noise in order to maintain the peace and quiet for the residents of the City. *See* Pgh. Code of Ordinances, Title 6, Conduct, Art. 1: Regulated Rights and Actions, Ch. 601, § 601.04. However, it does not pertain to routine traffic and pedestrian noise.

102.    Outside the fifteen foot buffer zone, Brown may otherwise stand in the path of oncoming pedestrians to offer literature or counseling and she is not required to move out of their way as they approach her.  (*Id.* at ¶ 100; Ordinance).

103.    The Ordinance places no restrictions on the number of speakers and allows conversations to occur at a distance of eight feet.  Brown may approach intended listeners if they consent to her approach.  Prior to engaging in conversations or providing intended listeners with leaflets or literature, Brown only needs to ask for consent.  (Docket No. 49, at 14 ¶¶ 101-102).

104.    There is a knowing requirement included in the Ordinance to prevent protesters from inadvertently violating the law.  (*Id.* at ¶ 104).

105.    Since the enactment of the Ordinance, Brown is still able to speak with women outside these facilities and she had not been arrested or fined before the filing of the instant action.  (*Id.* at ¶ 106).

106.    To this Court's knowledge, Brown has never been arrested or fined for a violation of the Ordinance.  Defendants provided notice to the Court, by letter dated December 12, 2007,[22] that two individuals have thus far been cited in accordance with the Ordinance at issue. One individual was found guilty at the district court level.  He appealed, and his conviction was reversed. The other individual's citation was dismissed at the district court level.  To the City Defendants' knowledge, no other citations, lawsuits, or appeals have been filed with respect to the Ordinance.

107.    Brown initially alleged that she was unable to continue in her activities at the health facilities because of the Ordinance.  (Docket No. 50, at 7 ¶ 60).  However, during oral arguments on December 19, 2007, it was represented to this Court that Brown has been able to continue in her protest activities during the pendency of this lawsuit.  (Trans. II, at 67:15-20).

---

[22] The City Defendants' letter is reproduced in Appendix B.

108.     Brown, according to her description of her activities, including running alongside women she believes to be patients, is classified as a protester.  Therefore, her conduct can be viewed as an obstacle to women seeking access to reproductive health facilities.  (Docket No. 49, at 16 ¶¶ 120-21).

109.     To the present day, Brown continues to engage in protest activities at the described Pittsburgh facilities.  (Trans. II, at 67:15-20).

## III.     Brown's Arguments

In support of her motion for preliminary injunction, Brown has brought an as applied challenge to the Ordinance claiming that it was enforced in a content-based manner, thus susceptible to strict scrutiny analysis.  (Docket No. 23, at 13).  Brown contends that the regulation fails strict scrutiny because (1) it is not narrowly tailored, (2) burdens more speech than necessary, and (3) fails to leave open ample alternatives of communication. (*Id.* at 21-22).  Additionally, she argues that the Ordinance fails to further the City's purported interests. (*Id.* at 16-17).   Within her as applied challenge, Brown claims that the enforcement of the Ordinance against her violates her rights pursuant to the Equal Protection Clause of the Fourteenth Amendment, the Free Exercise Clause of the First Amendment, and the Pennsylvania RFPA. (Docket No. 23).

As noted, Brown has not raised a facial challenge to the Ordinance within her motion seeking injunctive relief.  (Docket No. 22).  However, she has raised a facial challenge in her Verified Complaint, (Docket No. 1, at 7 ¶ 3, hereinafter "Complaint").  Furthermore, her proposed findings of fact and conclusions of law relate to her inability to understand the Ordinance because she contends it is overbroad and vague. (Docket No. 50, at 4-5 ¶¶ 30-36, 38-40; at 6-7, ¶¶ 22-23).  The parties dispute the facts surrounding the two incidents in which the City Police enforced the Ordinance against Brown in an alleged discriminatory manner.  Brown solely relies upon the facts

as stated herein regarding Officer Alexander's alleged discriminatory enforcement for her as applied challenge. However, even though her evidence of the City's alleged discriminatory enforcement is inadequate and disputed, it does not defeat her as applied challenge. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). Thus, at this juncture, we will consider both the facial constitutionality of the Ordinance itself and its constitutionality as applied to Brown's activities. *Foti*, 146 F.3d at 635; *see also NAACP v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir. 1984) (as applied challenges are the most common type of challenges to restrictions on speech activity and may be coupled with facial challenges); *Maldonado v. Houstoun*, 157 F.3d 179, 183-84 (3d Cir. 1998) (limited review is ordinarily appropriate at the preliminary injunction stage of a constitutional challenge to a law, but if the issue is legal and the facts are well established, the court need not abstain from addressing the constitutional issues).

The Court will first address the facial constitutionality of the Ordinance because if the regulation is found to be facially invalid, we need not address Brown's as applied arguments.[23]

## IV. Statutory Construction of the Ordinance

In order for the Court to determine the scope of the Ordinance at issue in the context of a facial challenge, pertinent Pennsylvania statutory construction must be applied. To entertain that analysis, the Court will first evaluate the source of the Defendant City's power in making the subject Ordinance.

### A.    Municipal Powers

---

[23] Brown raised a facial challenge in her Complaint as well as in her response to the Defendants' Motion to Dismiss. (Complaint at 7 ¶ 43; Docket No. 21 at 8).

In order to fully determine the nature of Ordinance No. 49, the Court first must consider the source of the Defendant City of Pittsburgh's municipal power in enacting the Ordinance and the limitations imposed on that power. As noted, the Defendant City of Pittsburgh is a city of the second class within this Commonwealth, and is considered a corporate and politic body which possesses certain powers established by the legislature. 53 PA. CONS. STAT. § 23102 (2007). A limitation on these conferred powers is that they must be exercised in a reasonable, lawful, and constitutional manner. *Kilcullen v. Webster*, 103 A. 592, 594 (Pa. Super. 1918). One of those powers is to enact ordinances for various statutory purposes. 53 Pa. CONS. STAT. § 23103 (2007). The statutory purposes which are relevant to the present action include: the power to regulate sidewalks, regulate city police and impose fines for the violation of any ordinance; protect persons and public property through suitable police regulations; and to prevent and restrain riots and disturbances. 53 PA. CONS. STAT. §§ 23115, 23120, 23124, 23131 (2007). Furthermore, the City has the power to make and enforce all necessary ordinances and regulations, and impose penalties for violations of such laws. 53 PA. CONS. STAT. § 23158 (2007). Ordinances established under Section 23158 must be consistent with the Constitution and the laws of this Commonwealth. 53 PA. CONS. STAT. § 23158 (2007).

**B.      Rules of Construction and Interpretation**

The Court must also follow Pennsylvania law, with its established rules of statutory construction, to ascertain the meaning of the Ordinance. *See e.g., Algrant v. Evergreen Valley Nurseries Ltd. Pshp.*, 126 F.3d 178, 188 (3d. Cir. 1997); *Combs v. Homer Ctr. Sch. Dist.*, 468 F.Supp.2d 738, 767-68 (W.D. Pa. 2006); *R.W. Sidley, Inc. v. United States. Fid. & Guar. Co.*, 319 F.Supp.2d 554, 561 (W.D. Pa. 2004). The Pennsylvania "rules of statutory construction are

applicable to statutes and ordinances alike." *In Re Thompson*, 896 A.2d 659, 669 (Pa. Cmwlth. 2006) (citation omitted). Therefore, just like a statute, an ordinance's words and phrases should be construed according to their common and approved usage. 1 PA. CONS. STAT. § 1903(a) (2007); *Algrant*, 126 F.3d at 188. Additionally, words may be interpreted by reference to other ordinances. 1 PA. CONS. STAT. §§ 1921(c), 1932 (2007); *Algrant*, 126 F.3d at 188.

The goal of interpretation and construction of the Ordinance is to ascertain and effectuate the intent of the law as expressed in its language. 1 PA. CONS. STAT. § 1921(a) (2007); *Panik v. Didra*, 88 A.2d 730, 493 (Pa. 1952); *Combs*, 468 F.Supp.2d at 767. Every law must be construed, if possible, to give effect to all of its provisions. 1 PA. CONS. STAT. § 1921(a); *Combs*, 468 F.Supp.2d at 767. When the language of a statute is free from ambiguity, it is not to be disregarded "under the pretext of pursuing its spirit." 1 PA. CONS. STAT. § 1921(a); *Combs*, 468 F.Supp.2d at 767. A court may consider the history of the legislation as an indicator of legislative intent, and statements made by legislators during the enactment process may properly be considered as part of the legislative history. *Nationwide Mut. Ins. Co. v. Hampton*, 935 F.2d 578, 591 (3d. Cir. 1991). This consideration gives effect to the true object and intention of the legislature. *Combs*, 468 F.Supp.2d at 767.

With respect to municipal ordinances, the Pennsylvania Supreme Court has specifically stated that the language used in such ordinances must be considered in the sense which harmonizes with, and gives effect to, the subject matter, general purpose and object sought to be achieved. *Cloverleaf Trailer Sales Co. v. Pleasant Hills*, 76 A.2d 872, 875 (Pa. 1950). A municipal ordinance should be reasonably interpreted in view of the purposes it was intended to serve. *Adams Outdoor Adv., L.P. v. Zoning Hearing Bd.*, 909 A.2d 469, 483-84 (Pa. Cmwlth. 2006). Additionally, the goal of the law

should be given effect in the light of the circumstances existing at the time of its enactment, with proper consideration for the consequences which would result from giving it a different or restricted meaning. *Id.* at 483-84.

In ascertaining the legislative intent of an ordinance, there are certain presumptions that may be applied. First, it is presumed that the legislators, or council members, do not intend to violate the Constitution of the United States or of this Commonwealth. *See* 1 PA. CONS. STAT. § 1922(3) (2007); *Combs*, 468 F.Supp.2d at 768. Secondly, it is presumed that the legislators intend to favor the public interest as against any private interest. 1 PA. CONS. STAT. § 1922(5) (2007); *Combs*, 468 F.Supp.2d at 768. Third, there is a strong presumption in favor of the constitutionality of legislative acts, including municipal legislation. 1 PA. CONS. STAT. § 1922(5). Fourth, the title of the law may also be considered in the construction and any other title, part, article, chapter, section or other division may be used to aid in construction. 1 PA. CONS. STAT. § 1924 (2007). Lastly, but importantly, the Court notes that the Ordinance at issue is to be liberally construed as to effectuate its objects and to promote justice. 1 PA. CONS. STAT. § 1928(c) (2007).

### C. Pertinent Statutory Background

Given the background of this suit, this Court must next examine the City Defendants' Ordinance in light of the pertinent statutory background in the areas of abortion and women's health and treatment at the time of its enactment. To that end, this Court notes that the federal government has sought to protect the privacy of health information and health care delivery. *See* 29 U.S.C. §§ 1181-82 (1996). This Court further notes that Pennsylvania provides privacy protection to patients seeking health care through various statutes. *See* 50 P.S. § 7111 (1996) (protects the disclosure of records for patients being treated for mental illness); 42 PA. CONS. STAT. § 5944 (1989) (a

30

psychotherapist or psychologist is prohibited from disclosing confidential communications); 42 PA. CONS. STAT. § 5929 (1995) (a physician is required to protect from disclosure communications received during a consultation for treatment or diagnosis); 42 PA. CONS. STAT. § 5945.1 (2000) (all communications between a sexual assault counselor and a victim, counselor, and/or co-participant are confidential); 42 PA. CONS. STAT. § 6155 (1998) (a patient's medical records are generally protected from compelled disclosure).

The federal government has also made it a crime to intentionally injure or use force by physically obstructing the access to reproductive health facilities. *See* 18 U.S.C. § 248 (1994) (Freedom of Access to Clinic Entrances, hereafter "FACE"). FACE also provides for civil rights actions and remedies for persons aggrieved by reason of conduct prohibited by the criminal section of the statute. *See* 18 U.S.C. §248(c) (1994).

In addition, the Commonwealth of Pennsylvania passed the Abortion Control Act, 18 PA. CONS. STAT. § 3201, *et seq.* (1989), which provides the statutory framework governing abortion in the Commonwealth.[24] The Act ensures that all women, especially minors, receive information about the risks, consequences, and alternatives to abortion to ensure that the patients give an informed consent to the procedure. 18 PA. CONS. STAT. § 3205 (1989); *In Re L.D.F.*, 820 A.2d 714, 716 (Pa. Super. 2003). In fact, physicians are required to provide all women with access to state produced materials, which offer information on alternatives to abortion. 18 PA. CONS. STAT. § 3205(2)(i); *In Re L.D.F.*, 820 A.2d at 716. Physicians must also inform their patients about medical assistance

---

[24] In the landmark decision *Roe v. Wade*, the Supreme Court held that abortion is within the scope of a woman's personal liberty guaranteed by the Due Process Clause. 410 U.S. 113 (1973). Subsequently, in 1992, the Supreme Court rejected the trimester framework and adopted an undue burden test for determining whether state regulations had the purpose or effect of placing substantial obstacles in the path of a woman seeking an abortion before viability. *Planned Parenthood v. Casey*, 505 U.S. 833 (1992).

benefits that may be available and that the father of the unborn child is "liable to assist in the support of [the] child," even if he has offered to pay for the abortion. 18 PA. CONS. STAT. § 3205(a)(2)(ii),(iii). With this in mind, the Court recognizes that the women Brown seeks to counsel are required by law to receive mandated information about abortion and its alternatives from their physicians upon becoming a patient.

## V.  The Impact of *Hill v. Colorado*

The challenged Section 623.03 of the Ordinance directly parallels the section of the Colorado statute that was held to be facially constitutional by the Supreme Court in *Hill v. Colorado*, 530 U.S. 703. *See* COLO. REV. STAT. § 18-9-122 (2007) (Another provision of the statute made it a misdemeanor "if such person knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a health care facility"). As discussed *infra*, the facts of *Hill* are substantially similar to the instant case. Therefore, the doctrine of stare decisis must be applied in determining whether this Court must follow *Hill*.

The following factors must be present before a prior decision has stare decisis effect:

(1)    The decision must constitute a holding of the majority of the court and if a particular result is adopted by a clear majority of the court, it has absolute precedential effect in substantially identical legal and factual circumstances.
(2)    The decision must involve an issue of law.
(3)    Similar factual situations must be involved.
(4)    An issue was actually determined by the decision.
(5)    The decision must be from the same court or from a court which the court applying stare decisis owes obedience.

3-30 MOORE'S MANUAL-FEDERAL PRACTICE AND PROCEDURE §30.11, (2007); (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 285 (2000); *Rappa v. New Castle County*, 18 F.3d 1043, 1061 (3d Cir. 1994); *EEOC v. Trabucco*, 791 F.2d 1, 4 (1st Cir. 1986); *Gately v. Commonwealth v. Mass.*, 2 F.3d

1221, 1226 (1ˢᵗ Cir. 1993); *United States v. La. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952).

The holding in *Hill v. Colorado* constituted a majority of the Court. *See Hill*, 530 U.S. at 705 (6-3 decision). The decision of *Hill* resolved the issue of whether Colorado's law, COLO. REV. STAT. § 18-9-122(3), was a constitutional speech-related restriction. *Id.* at 703. As discussed *infra*, the Ordinance at issue here and Colorado's statute are the same in content and both the City of Pittsburgh and Colorado passed these laws in the interest of public safety at health care facilities. Furthermore, the Defendant Pittsburgh City Council explicitly stated at the public hearings that the Ordinance was drafted in consultation with the City Solicitor and in accordance with Colorado's statute. (Docket No. 49-2, at 48). Because of the similarities between the Colorado statute at issue in *Hill* and the instant Ordinance, a careful review of *Hill* is warranted in evaluating the present Ordinance.

In upholding the Colorado statute in *Hill*, the Supreme Court made numerous pronouncements that influence this Court's decision on the present matter. The Supreme Court held that even though the Colorado statute singled out "oral protest, education, [and] counseling," it was content-neutral because this "denoted a broad category of speech rather than specifying a particular subject matter or viewpoint." *Hill*, 530 U.S. at 724-725; *see also McGuire v. Reilly*, 260 F.3d 36, 41 (1ˢᵗ Cir. 2001). The Supreme Court gave little credence to the argument that the Colorado law impermissibly discriminated against abortion protestors because it targeted health care facilities. *McGuire*, 260 F.3d at 41 (citing *Hill*, 530 U.S. at 724).

*Hill* bears on this case because Section 623.03 of the Ordinance is nearly a verbatim copy of the language of the Colorado statute. The two laws read as follows:

| City of Pittsburgh Ordinance No. 49 | Colorado's Statute |
|---|---|
| No person shall knowingly approach another person within eight feet (8') of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet (100') from any entrance door to a hospital and/or medical office/clinic. | No person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility. |
| Ordinance, Section 623.03 | COLO. REV. STAT. § 18-9-122(3) (2007). |

Section 623.01 of the Ordinance, providing for the intent of the Defendant City Council, also bears a strong resemblance to the intent section of the Colorado law. The two intent sections of the laws read as follows:

**City of Pittsburgh Ordinance No. 49**

The City Council recognizes that access to Health Care Facilities for the purpose of obtaining medical counseling and treatment is important for residents and visitors to the City. The exercise of a person's right to protest or counsel against certain medical procedures is a First Amendment activity that must be balances against another person's right to obtain medical counseling and treatment in an unobstructed manner; and the City of Pittsburgh Bureau of Police has been consistently called upon in at least two locations within the City to mediate disputes between those seeking medical counseling and treatment and those who would counsel against their actions so as to (i) avoid violent confrontations which would lead to criminal charges and (ii) enforce existing City Ordinances which regulate the use of public sidewalks and other conduct; such services require a dedicated and indefinite appropriation of policing services, which is being provided to the neglect of the law enforcement needs of the Zones in which these facilities exist.

The City seeks a more efficient and wide deployment of its services which will help reduce the risk of violence and provide unobstructed access to Health Care Facilities by setting clear guidelines for activity in the immediate vicinity of the entrances to Health Care Facilities.

Ordinance, Section 623.01

**Colorado's Statute**

The general assembly recognizes that access to health care facilities for the purpose of obtaining medical counseling and treatment is imperative for the citizens of this state; that the exercise of a person's right to protest or counsel against certain medical procedures must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and that preventing the willful obstruction of a person's access to medical.

 counseling and treatment at a health care facility is a matter of statewide concern. The general assembly therefore declares that it is appropriate to enact legislation that prohibits a person from knowingly obstructing another person's entry to or exit from a health care facility.

Colo. Rev. Stat. § 18-9-122(1)

There are three key similarities: (1) the protections of both the Colorado law and the presently challenged Ordinance apply to all health care facilities; (2) both laws specify an 100-foot radius around all covered facilities; and (3) both laws prohibit unwanted approaches within eight feet of anyone inside the specified area. COLO. REV. STAT. § 18-9-122(1), (3) (2007); and

35

Ordinance §§ 623.01, 623.03.  Similar to the instant Ordinance, the statute in *Hill* did not require a standing speaker to move away from anyone passing by.  Additionally, both regulations do not place any restriction on the content of any message that a speaker may wish to communicate, either inside or outside the designated areas.

In *Hill*, the Supreme Court began its analysis by evaluating the competing interests of the parties.  The Court determined that the legislative history made it clear that the activity of protestors at health care facilities, that offered abortion services amongst other services, was the primary reason for the law.  *Hill*, 530 U.S. at 714.  The activities of the protestors in handing out leaflets, displaying signs, and orally communicating were First Amendment protected activities.  *Id.* at 715.  The fact that the intended message of those communications may be offensive to listeners does not take away their constitutional protection.  *Id.*

However, the Supreme Court proclaimed that it is the traditional exercise of a state's police power "to protect the health and safety of their citizens."  *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)).  The governmental interest, weighing in favor of the law, sought to provide unimpeded access to health care facilities while seeking to avoid the potential trauma to patients associated with confrontational protest.  *Id.*  It is important to note that the Ordinance at issue here arose from the Public Safety Commission with these same interests in mind.  Moreover, the Ordinance was enacted partly to remedy the inefficient use of the City Police.  During the six months prior to December of 2005, the City Police were called to the downtown facility twenty-two (22) times.  (Docket No. 49-2, at 53; Docket No. 49-3, at 13).  Additionally, the police assignment at the downtown Planned Parenthood was eliminated due to city budget constraints.  (Docket No. 49-2, at 8, 52).

In conducting an interest analysis, the Court recognized "the significant difference between the state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Hill*, 530 U.S. at 715-16. Both the Colorado statute and the subject Ordinance deal only with the latter. *Id.* at 716. The Court noted that there is a recognizable privacy interest in avoiding unwanted messages but that privacy interest varies in different settings. *Id.* Specifically, the Court held that in the setting of a medical facility, "the First Amendment does not demand that patients undertake Herculean efforts to escape the cacophony of political protests." *Id.* (quoting *Madsen*, 512 U.S. 753, 772-73(1994)). "The right of every person 'to be let alone' must be placed in the scales with the right of other to communicate." *Hill*, 530 U.S. at 718 (quoting *Rowan v. Post Office Dept.*, 397 U.S. 728, 736 (1970)).

The Court next considered whether or not the statute was content-neutral. This inquiry is important in First Amendment challenges because it determines which level of scrutiny applies. If a statute is content-based it is presumptively invalid and can only be upheld if it survives strict scrutiny. If a statute is content-neutral, it is evaluated under the "time, place, or manner test" set forth by the Supreme Court in *Ward v. Rock against Racism*, 491 U.S. 781 (1989). Under that evaluation, a law must be narrowly tailored to advance a significant state interest while leaving open ample alternative means of communication. *Hill*, 530 U.S. at 719 (citing *Ward*, 491 U.S. at 791). The law must not burden substantially more speech than is necessary to further a government's significant interests. *Id.*

The Supreme Court determined that the Colorado law was content-neutral, thus subject to the time, place, or manner test. *Hill*, 530 U.S. at 719-20. In reaching this conclusion, the Court found:

First, it is not a "regulation of speech." Rather it is a regulation of the places where some speech may occur. Second, it was not adopted "because of disagreement with the message it conveys." This conclusion is supported not just by the Colorado courts' interpretation of the legislative history, but more importantly by the State Supreme Court's unequivocal holding that the statute's "restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech." Third, the State's intent in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of demonstrators speech.

*Id.* The Court went on to note that "[i]nstead of drawing distinctions based on the subject that the approaching speaker may wish to address, the statute applies equally to used car salesman, animal rights activists, fundraisers, environmentalists, and missionaries." *Id.* at 723.

The Court then applied the time, place, and manner test in concluding that the statute was valid under the test applied in *Ward* because it was narrowly tailored. *Hill*, 530 U.S. at 725. The Court found that the statute served significant and legitimate governmental interests and was narrowly tailored to serve those interests while leaving open ample alternatives for communication. *Id.* at 725-26. The Court emphasized that when a content-neutral regulation "does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means" of serving the stated interests. *Id.* at 726. There was no adverse effect on a reader's ability to read displayed signs nor did the regulation place any limitations on the number, size, text, or images of signs. *Id.* With respect to oral communications, the Court pointed out that the statute did not place limits on the number of speakers, the noise level, or the use of an amplification device. *Id.* The Court held that the eight foot zone allows a speaker to communicate at a normal conversational distance. *Hill*, 530 U.S. at 726-27. Furthermore, the statute did not prohibit a speaker from standing still while others passed within eight feet. *Id.* at

727. Lastly, the Court stated that "once again, it [was] worth reiterating that only attempts to address unwilling listeners [were] affected." *Id.*

The effect on the ability of a protestor to distribute handbills and leaflets was more scrutinized by the Court because "it seem[ed] possible" that an eight foot interval could burden the ability of a protestor to hand out literature to unwilling recipients. *Id.* In response to this concern, the Court held that the statute "does not prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept." *Hill*, 530 U.S. at 727.

The Court then stated that it "'must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary.'" *Id.* at 728 (quoting *Madsen*, 512 U.S. at 772). Additionally, it "noted the unique concerns that surround health care facilities" because hospital and clinics are where people are treated and where patients are often "'under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity,'" thus they "'need a restful, uncluttered, relaxing, and helpful atmosphere.'" *Hill*, 530 U.S. at 728 (quoting *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 783-84 n.12 (1979)). The Court concluded:

> Persons who are attempting to enter health care facilities – for any purpose – are often in vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach.

*Hill*, 530 U.S. at 729. Accordingly, the Court found the statute to be reasonable and narrowly tailored:

> [T]he 8-foot restriction on an unwanted physical approach leaves

39

ample room to communicate a message through speech. Signs, pictures, and voice itself can cross an 8-foot gap with ease. If the clinics in Colorado resemble those in *Schenck*, demonstrators with leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and without physically approaching those who are entering the clinic, peaceably hand them leaflets as they pass by.

*Id.* at 729-30 (citations omitted).

In this Court's estimation, *Hill* is controlling in interpreting the Ordinance at hand.

The Court interprets the Ordinance's language according to its common usage. Thus, in the Court's estimation, the language requiring consent means that a person must first get permission from another before approaching to hand out literature or engage in oral protest. Additionally, the statements made by City Council members during the legislative process further support their stated intent to provide additional safety measures to all individuals on the sidewalks outside the health care facilities. In construing the intent of the Ordinance, the Court may consider this evidence as part of the legislative history. *Hampton*, 935 F.2d at 591.

The Court finds the Ordinance to be reasonable in light of the purposes it intends to serve, i.e, to provide for the safe and unobstructed access to health care facilities and to promote a more efficient use of the City Police. In reaching its decision, the Court has placed the Ordinance's stated purposes in the balance with other laws protecting the right to be let alone. The City Defendants' Ordinance is reasonable when construed in conjunction with federal and Pennsylvania law concerning the privacy of health information and health care delivery.

## VI.    First Amendment Facial Challenge

Brown has made a facial challenge to the Ordinance, arguing that the Ordinance is an invalid time, place, and manner regulation, an unconstitutional prior restraint on speech and violative of

the principles of vagueness and overbreadth. (Docket No. 1, at 12 ¶¶ 73-76, at 13 ¶¶ 79-83, at ¶¶ 88, 92-93; Docket No. 23, at 10, 14, 18-19). It is not disputed that Brown's leafleting and speaking with members of the public in the traditional public forum are constitutionally protected activities. *See Hill v. Colorado*, 530 U.S. 703, 715 (2000). Indeed, Brown's speech activity in the traditional public forum of public streets and sidewalks is protected under the First Amendment. *Frisby v. Shultz*, 487 U.S. 474, 480 (1988). Thus, the City Defendants' regulation of speech in places considered to be traditional public fora must be analyzed with the highest scrutiny. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).

We will begin by considering the competing interests of the parties. Brown's First Amendment rights in counseling, leafleting, and orally communicating are clear and undisputed. The fact that the intended message of the Plaintiff's communications may be offensive to listeners does not take away their constitutional protection. *Hill*, 530 U.S. at 715. The minutes of the City Council's open public meetings in addition to the City's stated intended interests explained in Section 623.01 of the Ordinance make it clear that the activity of the protestors at the facilities was one of the primary reasons for the Ordinance. (*See* Ordinance, Section 623.01).

The Supreme Court has held that it is a proper traditional exercise of state police power to protect the health and safety of their citizens. *Hill*, 530 U.S. at 715 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)). The City of Pittsburgh has a significant and legitimately valid interest in ensuring public safety and order, promoting the free flow of traffic on public streets and sidewalks, and providing for the peaceful and non-violent accessibility to medical health facilities. *Madsen*, 512 U.S. at 768 (citing *Operation Rescue v. Women's Health Ctr.*, 626 So.2d 664, 672 (1993)); *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997); *see also*

41

*U. S. v. Gregg*, 226 F.3d 253, 268 (3d Cir. 2000) (statute that seeks to promote important governmental interest in public safety and a woman's right to seek reproductive services held constitutional). Like the statute in *Hill*, the present Ordinance "seeks to provide unimpeded access to health care facilities while seeking to avoid the potential trauma to patients associated with confrontational protests." *Hill*, 530 U.S. at 715. The Court recognizes the vast differences between a government's laws that protect listeners from unwanted communication and those that restrict a speaker's right to address a willing audience. *Id.* at 715-16. The Ordinance only deals with the former. Moreover, there is a recognizable privacy interest in avoiding unwanted communications. The right of one to communicate must be balanced against the right "to be let alone." *Id.* at 718 (citing *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 736 (1970)).

The level of scrutiny used to test the validity of the challenged Ordinance depends on whether the Ordinance provides restrictions that are "justified without reference to content...that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). When an ordinance is content neutral on its face, it is evaluated under the time, place, and manner test as set forth by the Supreme Court in *Ward*. Within that test, a government may not burden speech more than is reasonably necessary to further its legitimate interests. *Ward*, 491 U.S. at 799.

Alternatively, when a law regulates speech based upon prohibited content, it must pass strict scrutiny muster to be upheld, therefore it must be narrowly tailored to achieve a compelling governmental interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The issue for the Court then is to identify the harm the City seeks to remedy, and to determine

whether the City's Ordinance is narrowly tailored to remedy that evil. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Halfpap v. City of West Palm Beach*, No. 05-80900, at 39 (S.D. Fla. April 11, 2006); *Frisby*, 487 U.S. at 485 (citing *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808-810 (1984)). A facial challenge claims that a law "is invalid *in toto*-and therefore incapable of any valid application." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (citing *Steffel v. Thompson*, 415 U.S. 452, 474 (1974)). The Supreme Court has held that a person has standing to facially challenge an ordinance that allows for overly broad discretion to city officials or that contains impermissible content-based restrictions on speech. *See, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759 (1988).

It is undisputed that Brown's speech activity is constitutionally protected, thus the question within this facial determination becomes whether the City has adopted a regulation of speech "without reference to the content of the regulated speech." *Madsen*, 512 U.S. at 763 (quoting *Ward*, 491 U.S. at 791).

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill*, 530 U.S. at 719 (quoting *Ward*, 491 U.S. at 791). The controlling consideration is the government's purpose. *Ward*, 491 U.S. at 791. "A statute or regulation that serves purposes and goals unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or message but not others." *Id.* "Government regulation of expressive activity is content neutral so long as it is 'justified

without reference to the content of the regulated speech.'" *Id.* (quoting *Clark v. Cmty. for Non-Creative Violence*, 468 U.S. 288, 293 (1984)).

The present Ordinance is not a regulation of speech, rather it is a regulation of the places where speech may occur. The clear intent behind the Ordinance is to provide patients with "unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired." (Ordinance, Section 623.01). Additionally, the Ordinance was enacted to promote "a more efficient and wide deployment" of its police services to reduce the risk of violence. *Id.* Similar to the Colorado statute, it was not enacted "because of disagreement with the message it conveys." *Hill*, 530 U.S. at 719-20 (quoting *Ward*, 491 U.S. at 791). The law's restrictions apply equally to all protestors, regardless of their message, and it makes no reference to the content of speech. *Id.* (citing *Madsen*, 512 U.S. at 762-63). The City's intent is to protect the access and privacy of the City's health care facilities, while providing the police with clear guidelines to follow when enforcing the ordinance, which are unrelated to the content of the protestors' speech. The City Defendants' Ordinance does not authorize the Mayor or his designees to pass judgment on the content of speech. None of the grounds for enacting and enforcing the Ordinance involve an assessment of what that speaker may say. (*See* Ordinance, Section 623.01). Furthermore, the Pittsburgh City Police Commander has stated that City Police can lawfully enforce the Ordinance. (Docket No. 49-2, at 50-52). Thus, this Court finds that the Ordinance applies equally to all speech and is a content-neutral regulation. As a result, the Ordinance is subject to the time, place and manner test.

"A regulation of the time, place, or manner of protected speech must be narrowly tailored

to serve the government's legitimate, content-neutral interests," however it need not be the least restrictive or least intrusive means of doing so. *Ward*, 491 U.S. at 798. The regulation must also leave open ample alternative avenues of communication. *Hill*, 530 U.S. at 729-30. In evaluating a facial challenge, the Court will consider the City's "authoritative constructions of the [O]rdinance, including its own implementation and interpretation of it." *Arietta v. City of Allentown*, No. Civ. A. 04-226, 2004 WL 1774623, at *8 (E.D. Pa. 2004) (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)).

The Ordinance makes it unlawful, absent consent, to "knowingly approach within eight feet of a person for the purpose of passing a leaflet, handbill, display a sign to, or engage in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of 100 feet from any entrance door." (Ordinance, Section 623.03). This statutory limitation is not absolute. The goal of the floating buffer zone precludes speakers from *knowingly approaching* unconsenting listeners; it does not prevent speakers from standing their ground nor does it require them to retreat from pedestrians.

The Court concludes that the Ordinance's stated goals justify its specific application to activities at or near reproductive health facilities in the City of Pittsburgh. The City Council, faced with apparently serious public safety problems at or near these clinics, dealt with potential protesting on a strictly objective basis. (*See* Docket No. 49-2 and Docket No. 49-3, Public Hearing Minutes from December 7, 2005 and December 13, 2005, respectively). It analyzed the evidence, promulgated by investigation, which showed that protestors outside these facilities can be especially aggressive and, therefore, patients are extremely vulnerable as they enter or leave these facilities. (Docket No. 49-2, at 12-14, 18, 20-21, 35, 38-39, 43, 49, 53-54, 60; Docket No. 49-3, at 13, 15, 19).

45

The legislative history of the Ordinance does not speak to abortion *per se*, but to the violent confrontations and particular vulnerability of patients leaving and entering the facilities while facing hostile environments. *Id.*

The Supreme Court has recognized a government's interest in protecting citizens from unwarranted or unsolicited communications. *See e.g., Frisby v. Shultz*, 487 U.S. 474 (1988) (the nature of a private residence warrants heightened protection of the unwilling listener). The Court has explicitly held that the "First Amendment permits the government to prohibit offensive speech as intrusive when 'the captive' audience cannot avoid the objectionable speech." *McQueary v. Stumbo*, 453 F.Supp.2d 975, 988 (E.D. Ky. 2006) (quoting *Frisby*, 487 U.S. at 487). Outside the home, it is recognized that a citizen may be held "captive" to unwanted communications. *See Madsen*, 512 U.S. at 768; *Shenck*, 519 U.S. at 376 n.8. However, the government interest in protecting the medical privacy and well-being of patients that are held "captive" is also relevant. *Madsen*, 512 U.S. at 768. Furthermore, the Supreme Court has recognized the right of its citizens to "be left alone" as much as the "right of others to communicate." *Hill*, 530 U.S. at 716. "The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified,...it is an aspect of the broader 'right to be let alone'...characterized as the most comprehensive of rights and the right most valued by civilized men" *Id.* at 716-17 (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)). The privacy of a home warrants the special right to unwelcome speech, but can also be protected in confrontational settings. *Hill*, 530 U.S. at 717 (citing *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 738 (1970)).

Furthermore, the federal government has recognized the importance of protecting the privacy of individuals seeking access to reproductive health facilities. *See* 18 U.S.C. § 248 (1994)

(FACE). Under FACE, it is a crime to intentionally injure or use physical force to obstruct the access to reproductive health facilities. *Id.* The act also permits a civil cause of action for individuals aggrieved by conduct proscribed by the criminal section of the statute. 18 U.S.C. § 248(c)(1994). The statute was constitutionally upheld under the First Amendment and held not to violate the principles of overbreadth and vagueness. *American Life League v. Reno*, 47 F.3d 642 (4th Cir. 1995), *cert. denied*, 516 U.S. 809 (1995); *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995). Because the statute does not discriminate against speech or conduct that is related to abortion, similar to the Ordinance at issue here, it was held to be content neutral while furthering substantial governmental interests. *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996), *reh., en banc, denied*, 1996 U.S. App. LEXIS 10908, *cert. denied*, 519 U.S. 1043 (1996).

In order for the Ordinance to be "narrowly tailored," it must not "burden substantially more speech than is necessary to further the government's [stated] substantial interests." *Ward*, 491 U.S. at 799. A regulation will meet this standard if it "targets and eliminates no more than the exact source of the 'evil' that it seeks to remedy." *Frisby*, 487 U.S. at 485 (citing *City Council of L.A.*, 466 U.S. at 808-810). The city may not regulate "expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 800. Nevertheless, the Ordinance "need not be the least restrictive or least intrusive means" of furthering the government's interest. *Ward*, 491 U.S. at 798.

The Ordinance does not completely prohibit any means of communication, thus it may satisfy the tailoring requirement "even though it is not the least restrictive or least intrusive means" of serving the stated interests. *Hill*, 530 U.S. at 726. The Ordinance does not adversely affect a person's ability to read displayed signs nor does it place any limitations on the number, size, text,

or images of signs.  With respect to oral communications, the Ordinance does not place limits on the number of speakers, the noise level, or the use of an amplification device.  The eight foot zone allows a speaker to communicate at a normal conversational distance.  Furthermore, a speaker is permitted to stand still while others pass within eight feet; "only attempts to address unwilling listeners are affected."  *Id.* at 727.  Moreover, the Ordinance does not prevent a leafletter, such as Brown, from simply standing near the path of oncoming pedestrians and offering her material, which the pedestrian can easily accept.  *Id.*

The context of Brown's activities and the location of the facilities in the instant case are important to consider in determining whether the Ordinance burdens more speech than necessary. The Supreme Court has noted "the unique concerns that surround health care facilities" because these facilities provide needed medical treatment to patients that are often particularly vulnerable due to emotional distress.  *Id.* at 728.  These patients need quiet and comforting environments where they can receive health services in a "restful, uncluttered, relaxing, and helpful atmosphere."  *Id.* at 728-29.  The Defendant City of Pittsburgh has responded to "its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontation" by enacting an ordinance with "exceedingly modest restrictions on [a] speaker's ability to approach."  *Id* at 729.

The First Amendment does not "guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."  *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 610, 647(1981)); *see also Knowles v. City of Waco*, 462 F.3d 430, 434 (5th Cir. 2006).  The First Amendment protects Brown's chosen avenue of speech – her direct one-on-one

48

communication.  *See Meyer v. Grant*, 486 U.S. 414, 424 (1988).  It also protects her choice to choose any other particular means or avenue of speech.  However, this is not equal to saying that Brown has a First Amendment right to dictate the manner in which she conveys her message within her chosen avenue of direct in person communication.  The Defendant City "may regulate the manner of speech in a content-neutral way but may not infringe on [her] right to select the means of speech." *Foti*, 146 F.3d at 641-42 (emphasis omitted).  The Ordinance does not limit the avenue of speech with which Brown chooses to convey her message.  It limits the manner by which her messages are conveyed by limiting the distance between her and listeners.  The Court finds that the eight foot zone leaves open ample room to communicate as Brown can easily stand on the sidewalks in front of the clinic entrances without physically approaching anyone and peacefully hand women her literature as they walk by.  Such persons can thus accept or decline.

A. **Vagueness**

Brown challenges the Ordinance arguing that it is unconstitutionally vague as applied to her and, in general, because it endows the police with too much discretion in applying the terms of the Ordinance in its enforcement of the law.  (Docket No. 35-2, at 21).

A fundamental requirement of due process is that a statute must clearly delineate the conduct it proscribes.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The Supreme Court has recognized that "arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.' " *Riel v. City of Bradford*, 485 F.3d 736, 755 (3d Cir. 2007) (quoting *Forsyth*, 505 U.S. at 130-31).  An ordinance must be sufficiently clear as to allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at

49

108.

Ordinances which are insufficiently clear and precise in their terms are determined to be invalid for the following three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment Freedoms. *Foti*, 146 F.3d at 638 (citing *Grayned*, 408 U.S. at 108-09).

Brown first argues that the Ordinance is vague because it fails to provide her and others, with ordinary intelligence, a reasonable opportunity to know what it means. She further claims that the Ordinance is vague because it encourages arbitrary and discriminatory enforcement.

Her first argument fails because the Ordinance contains a scienter requirement.[25]  In this Court's opinion, it is improbable that anyone of average intelligence would not understand the wording of the Ordinance.  Additionally, the hypothetical situations[26] that Brown has put before the Court will not support a facial or as applied challenge to an ordinance that "is surely valid in the vast majority of its intended applications."  *Hill*, 530 U.S. at 705 (citation omitted).  The Court is also not convinced that unbridled discretion is given to the City's law enforcement as argued by Brown. (Docket No. 35-2, at 21).  The Ordinance clearly defines and describes the zones protected.  Thus, the Ordinance, enacted to ensure the public safety of both protestors and patients by limiting

---

[25]Scienter is defined as "a degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly." BLACK'S LAW DICTIONARY 1081 (7th ed. 2000).

[26]Brown argued that the Ordinance is vague because there is a question of whether "to apply the Ordinance to a woman discussing abortion with a friend as they leave a restaurant within the restricted area – even if the abortion facility is not open." (Docket No. 23, at 22).  Brown also argued vagueness asking "whether the Ordinance should be applied to employees of neighboring businesses as they hand out advertisements in the public way and sidewalk area?  Or whether to apply it to protestors opposing [the pornography store] in the restricted area?" *Id.*

the manner in which messages are expressed while on public sidewalks adjacent to any health facility and prohibiting a person from willfully approaching a listener within eight feet, is not impermissibly vague.

Furthermore, Brown's hearing testimony shows that she understands the Ordinance and what it means – she testified that she cannot approach an individual without his or her consent and if she does she is subject to arrest, detention, and a fine. (Docket No. 50, at 7 ¶¶ 58-60, 65; Trans. I, at 45:1-3, 48:8-12).[27] The Court also notes that Brown is a long time registered nurse working in the emergency department. Therefore, because of her occupation and training, the Court can reasonably infer that she understands what consent means,[28] as she would have come into contact with the concept of informed consent time and again in her profession as a registered nurse. (Docket No. 23, at 1). Hence, this Court is not persuaded that Brown does not understand what "consent" means under the Ordinance. The Supreme Court has noted that "[a]s always, enforcement requires the exercise of some degree of police judgment," and the degree of judgment endowed to the Pittsburgh city police is acceptable. *Hill*, 530 U.S. at 733 (citing *Grayned*, 408 U.S. at 114). Moreover, Pittsburgh's Police Commander stated that the City Police could lawfully follow and enforce the Ordinance. (*See* Docket No. 49-2, at 50-52). Based on the record before

---

[27]Black's Law Dictionary defines consent as "[a]greement, approval, or permission as to some act or purpose, esp. given voluntarily by a competent person." BLACK'S LAW DICTIONARY 130 (2ⁿᵈ pocket ed. 2001).

[28]Informed consent concerns a physician's duty to provide "a patient with information that will enable [him or her] to 'evaluate knowledgeably the options available and the risks attendant risks upon each' before subjecting that patient to a course of treatment." *Hinman v. Dello Russo*, 2008 U.S. App. LEXIS 474, at *1 (3d Cir. 2008)(quoting *Matthies v. Mastromonaco*, 733 A.2d 456, 461 (N.J. 1999)) (medical malpractice case where plaintiff alleged she was given adequate informed consent); *see also Montgomery v. Bazaz-Sehgal*, 798 A.2d 742, 749 (Pa. 2002) (medical malpractice suit holding that a physician's failure to obtain informed consent from a patient sounds in battery). Additionally, Pennsylvania's Abortion Control Act, as discussed supra, requires physicians to obtain informed consent before pursuing any procedure. 18 PA CONS. STAT. §3205(2)(1989). Black's Law Dictionary defines informed consent as " a patient's knowing choice about treatment or a procedure, made after a physician or other healthcare provider discloses whatever information a reasonably prudent provider in the information medical community would provide to a patient regarding the risks involved in the proposed treatment." BLACK'S LAW DICTIONARY 244 (7ᵗʰ ed. 2000).

51

this Court, the Ordinance is not unconstitutionally vague.

**B.      Overbreadth**

Brown next argues the Ordinance is overbroad as applied to her because it protects too many people in too many places, rather than just the patients at the facilities where her speech occurs. (Docket No. 50, at 22).  She argues that the Ordinance is overinclusive because it burdens her purportedly peaceful speech activities rather than just persons with a history of aggressive and violent conduct towards others, which is an interest alleged to be furthered by the Ordinance.

An ordinance that is clear and precise in its terms "may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned*, 408 U.S. at 114.  The Supreme Court has held that the fact that "the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance." *Hill*, 530 U.S. at 730-31.  The vital question then becomes "whether the ordinance sweeps within its limits what may not be punished under the First and Fourteenth Amendment." *Grayned*, 408 U.S. at 115.

Here, the important fact to keep in mind is that all persons accessing the health care facilities share the goals served by the Ordinance. *See Hill*, 530 U.S. at 731.  The Defendant City Council made a general policy choice; therefore, the claimed overbreadth of the Ordinance is assessed under the constitutional standard set forth in *Ward*, rather than a higher standard of scrutiny. *See Madsen*, 512 U.S. at 764; *Hill*, 530 U.S. at 731.  The Ordinance does not ban any forms of communication or message.  Rather, it merely regulates the places where communication may occur. *Hill*, 530 U.S. at 731.  Furthermore, the City Defendants had the benefit of *Hill* and its progeny in drafting the present regulation.  As in *Hill*, the "comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Id.*  The Ordinance

52

simply does not ban any type of communication, it merely regulates where it may occur. Brown has not shown that the Ordinance's impact on the conduct of other speakers will differ from its impact on her own sidewalk counseling. *See Id.* at 705 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). For the reasons discussed herein, and based upon the evidence before this Court and pertinent precedent, this Court finds that the Ordinance is not unconstitutionally overbroad.

### C. Prior Restraint

Brown claims that the Ordinance is a prior restraint on her speech because it "bars speech in advance of expression and requires her to obtain consent before approaching individuals." (Docket No. 35, at 18). "A prior restraint on speech comes into play when the government conditions an individual's right to speak upon the prior approval of a government official." *Dowling v. Woodbridge*, No. Civ.05-313, 2005 WL 419734, at *7 (D.N.J. 2005) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969)). A regulation will be found invalid as a prior restraint when it gives "*public officials* the power to deny the use of a forum in advance" of speech. *Ward*, 491 U.S. at 795 n.5 (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (emphasis added). Prior restraint brings with it a "heavy presumption against its constitutional validity." *Conrad*, 420 U.S. at 558. In those cases where an unconstitutional prior restraint was found, the regulations allowed a single, private actor to unilaterally silence a speaker even as to willing listeners. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 880 (1997).

The prior restraint argument presented by Brown was rejected by the Supreme Court in *Hill*, *Schenck*, and *Madsen*. In *Hill*, the Court noted that any concerns regarding "prior restraint" relate to restrictions imposed by official censorship; however, the regulations at issue there only applied

if the pedestrian did not consent to the approach.  *See Hill*, 530 U.S. at 733; *see also Schenck*, 519

U.S. at 374 n.6; *Madsen*, 512 U.S. at 764 n.2.  Under the Ordinance, no method of communication

is foreclosed, and no speaker is prohibited from expressing his or her message.  The Ordinance

requires only that a willing listener consent to the speaker's approach and counseling in advance

of the speaker doing so.  It in no way bans nor prohibits the speaker's ultimate message.  This Court

finds that, based upon the evidence and pertinent precedent, the Ordinance's consent requirement

does not place a prior restraint on speech.  The Court now turns to Brown's request for an

injunction.

## VII.    Standard for Granting a Preliminary Injunction

A district court may grant the "extraordinary remedy" of a preliminary injunction upon

consideration of the following four factors:

> (1)    whether the movant has shown a reasonable probability of
>        success on the merits;
> (2)    whether the movant will be irreparably injured by denial of the
>        relief;
> (3)    whether granting the preliminary relief will result in even greater
>        harm to the nonmoving party; and
> (4)    whether granting the preliminary relief will be in the public
>        interest.

*Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 140 (3d Cir. 2000) (quoting

*Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997)); *see also*

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999); *NutraSweet Co. v. Vit-Mar*

*Enterprises*, 176 F.3d 151, 153 (3d Cir. 1999).  A district court is required to balance these factors

when determining if an injunction should issue.  *See Allegheny Energy*, 171 F.3d at 158.

Additionally, "[t]he decision to grant or refuse a preliminary injunction is within the sound

discretion of the district court." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1242 (3d Cir. 1983) (citation omitted).

The burden of proving the need for injunctive relief lies with the plaintiff to establish every element in her favor and if that is not accomplished, the injunction is inappropriate. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). A preliminary injunction has been described as an equitable remedy not to be "lightly indulged in" but only employed in those cases where it is plain and clear that the facts justify such relief. *Boyd v. Imhoff*, Civil Action No. 04-206, 2006 U.S. Dist. LEXIS 18147, at *2-3 (W.D. Pa. Mar. 27, 2006) (citing *Plain Dealer Publishing Co. v. Cleveland Type. Union #53*, 520 F.2d 1120, 1230 (6th Cir. 1975), *cert. denied*, 428 U.S. 909 (1977)). When evaluating a request for injunctive relief based on a First Amendment challenge, it is apparent that the first prong is the most important and the most dispositive, that is whether the Ordinance violates the First Amendment. *ACLU v. Ashcroft*, 322 F.3d 240, 250-51 (3d Cir. 2003). Additionally, the irreparable harm prong of this test is not dispositive of Plaintiff's Motion for Preliminary Injunction. A party cannot succeed simply by establishing a risk of irreparable harm. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). Instead, the moving party must make a clear showing of immediate, irreparable injury. *ECRI*, 809 F.2d at 226 (citing *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1985)).

After careful consideration and for the reasons that follow, the Court finds that the Plaintiff has not demonstrated an immediacy for relief and that the Plaintiff has failed to make a clear showing of irreparable injury to her constitutional rights. Moreover, in light of *Hill*, discussed in

more detail *infra*, the Court finds the Ordinance to be reasonable. Therefore, this Court DENIES the Plaintiff's Motion for Preliminary Injunction [DE 22].

## VIII.  Discussion

### A.  Reasonable Probability of Success on the Merits

#### *1.  First Amendment As Applied Challenge*

In determining Brown's probability of success on the merits, the Court will now address Brown's as applied challenge to Sections 623.03 and 623.04 of the Ordinance on the basis of her argument that these provisions are unconstitutional. Specifically, Brown moves to enjoin enforcement of the Ordinance on the basis that it violates her rights pursuant to the Equal Protection Clause, the Free Exercise Clause, and the Pennsylvania RFPA. (Docket No. 23).

Brown challenges the validity of the Ordinance as applied to her individual protest activities outside various women's health facilities arguing that the City police officers enforced the Ordinance in a content-based manner as to her. For this proposition, she refers to the following two incidents: (1) on January 28, 2006, Officer Alexander allegedly told her that she could distribute anti-pornography literature but not anti-abortion literature (which he denies) (Trans. I, at 37:8-14); and (2) in September of 2006, Brown claims that she witnessed health facility employees violate the Ordinance while the City police officers who allegedly also witnessed the same event did not enforce the Ordinance against the clinic employees, but did enforce it against Brown. (Docket No. 50, at 16 ¶164-170). The City has controverted these facts.

An as applied challenge proposes that the Ordinance is unconstitutional as applied to Brown's particular speech activity, even though it may be capable of valid application to others. *Vincent*, 466 U.S. at 803, n.22. This type of challenge does not involve the enforcement of the

Ordinance against individuals other than the challenger. Brown may individually argue the discriminatory enforcement of this speech restriction based upon viewpoint discrimination in violation of her civil rights. *See Foti*, 146 F.3d at 635 (citing *INS v. FLRA*, 855 F.2d 1454, 1467 (9th Cir. 1988)). As discussed *supra*, as applied challenges may be coupled with facial challenges. *See, e.g., City of Richmond*, 743 F.2d at 1352. "A successful as applied challenge does not render the law itself invalid but only [this] particular application of the law." *Foti*, 146 F.3d at 635. The Court now considers Brown's arguments in relation to her as-applied challenge.

### 2. *Equal Protection Claim*

Brown argues the enforcement of the regulation against her violates her Equal Protection rights because in her estimation it was enforced in a content-based manner, it lacks narrow tailoring, it fails to leave open ample alternatives for communication, and it fails to further the Defendant City's interests. (Docket No. 50, at 20-23).

Under the Equal Protection Clause of the Fourteenth Amendment, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Supreme Court proclaimed that an equal protection analysis requires strict scrutiny of a legislative action when that action "impermissibly interferes with the exercise of a fundamental right." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Since the case at hand involves the fundamental right to engage in free speech, strict scrutiny is warranted. *See Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 680 (1994).

The standard for a Fourteenth Amendment equal protection discriminatory enforcement challenge requires the proponent to prove that the government, through a government actor,

intended to discriminate against the disfavored person or group. *See McGuire*, 386 F.3d at 63. The challenger to a facially neutral law must show a policy, custom or "pattern of unlawful favoritism" on the part of the government in order to succeed on an equal protection claim. *Id.* (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002)). The plaintiff must show more than a merely disproportionate burden on her chosen method of speech. *McGuire*, 386 F.3d at 63. Furthermore, any alleged discriminatory enforcement of a law by private individuals does not constitute state action. *See McGuire*, 386 F.3d at 59; *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (state action is a necessary component of a constitutional claim against a state); *Hudgens v. NLRB*, 424 U.S. 507, 514-21 (1976) (First Amendment claim requires state action). The First Amendment is "concerned with government interference, not private jousting in the speech marketplace." *McGuire*, 386 F.3d at 60.

The Ordinance is obviously the product of state action, and acts done under the authority of that regulation can be considered state action if the acts are done jointly by private and state actors. *See, e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982). As the Supreme Court noted in *Lugar*, "it all depends on what is being challenged: state action is present in this way only if what the plaintiff is really aiming at is the constitutionality of the statute itself, [f]or example, there is no state action if what the plaintiff is really aiming at are the acts of private persons that are actually illegal under the statutory scheme, because then the acts do not reflect the policy of the state." *Lugar*, 457 U.S. at 940-42. To the extent that Brown is claiming that the Ordinance is unconstitutional as applied to her merely because private individuals, such as clinic escorts and employees are engaging in conduct violative of the Ordinance, her claim fails because

the actions of those private individuals do not amount to state action.  *See McGuire*, 386 F.3d at 59-60.  Moreover, she has not included any of them as defendants in this action.

We now address Brown's argument that because the City police officers purportedly enforced the Ordinance in a discriminatory manner as to her, relief is warranted under the Equal Protection Clause.  A municipality may be liable under Section 1983 only if it can be proven that municipal employees have violated a person's civil rights as result of a municipal policy or practice. *Williams v. West Chester*, 891 F.2d 458, 467 (3d Cir. 1989) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)); *see also Cox v. Pate*, Civil Action No. 05-1712, 2007 U.S. Dist. LEXIS 14419 (W.D. Pa. Feb. 27, 2007); *Amnest Am. v. County of Allegheny*, 822 F.Supp. 297, 300 (W.D. Pa. 1993).  One of the primary issues in evaluating an equal protection claim is whether "the relevant government actor intended to discriminate against the disfavored group." *McGuire*, 386 F.3d at 63 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985); *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)).  In this context, intent means more than mere knowledge by the government actor that a policy has a discriminatory effect; the government agent must have adopted the policy because of, and not despite, its discriminatory impact.  *Wayte*, 470 U.S. at 610; *Feeny*, 422 U.S. at 279.  In order to prevail, Brown must show that the Defendant City caused the alleged constitutional violation of which she complains through a municipal custom, practice, or policy.  *See Monell*, 436 U.S.  at 694.  Additionally, in order to succeed on an as-applied First Amendment viewpoint discrimination claim, some showing of intent on the part of the government is necessary.  *See McGuire*, 386 F.3d at 63.

In this Court's view, the Ordinance in this case is facially neutral based on motivations clearly void of invidious viewpoint discrimination.  "The fact that one side of the abortion debate

might suffer some incidental adverse effects or burdens did not defeat the statute's constitutionality." *McGuire*, 386 F.3d at 63. Any evidence of unequal enforcement merely indicates a disproportionate burden that does not amount to viewpoint discrimination, unless the relevant government actors intentionally and selectively enforced the Ordinance. *Id.* Additionally, the Supreme Court has stated that in order to succeed on a viewpoint discriminatory enforcement challenge against a law that is facially constitutional, the challenger must show "a pattern of unlawful favoritism." *Thomas*, 534 U.S. at 325. Brown has failed to make such a showing. Furthermore, she has failed to present clear evidence that the officers were acting based upon an established invidious custom, policy, or practice. She refers to only two instances where the police allegedly sought to enforce the Ordinance against her. Furthermore, the facts of those two incidents are disputed and it was presented to the Court that Brown has continued in her protest activities to this day. (Trans. II, at 67:15-20). This evidence does not amount to "a pattern of unlawful favoritism." *Id.* Therefore, this Court finds that the Plaintiff's Equal Protection claim fails.

### 3. Free Exercise Claim

Brown argues her Free Exercise rights were violated by the Ordinance because its application places a substantial burden on her religious exercise. (Docket No. 50, at 24 ¶¶ 34-35). For this argument, she claims that the City Defendants' enforcement triggers strict scrutiny. (*Id.* at 25 ¶¶ 39-41).

The Free Exercise Clause states that "Congress shall make no law prohibiting the free exercise" of religion. U.S. CONST. amend. I. Free exercise protections are triggered when a law "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

U.S. 520, 532 (1993) (citing *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961)). When a statute or regulation is applied in a discriminatory fashion based upon religious beliefs, strict scrutiny is triggered. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002) (the nature of the challenged action determines whether a free exercise claim prompts either strict scrutiny or rational basis review). "A law that is neutral and that is of general applicability does not need to be justified by a compelling interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531 (citation omitted).

Brown has failed to show that the enforcement of the Ordinance against her substantially burdens her right to Free Exercise. The Ordinance restricts only the place where Brown may counsel listeners regarding her religious beliefs. It in no way forecloses her ability to engage in sidewalk counseling or leafleting on any and all issues she considers important to her stated deeply-held religious beliefs. Brown is not prohibited from speaking or leafletting in the exercise of her religion; instead, it is only the location and manner in which she may engage in her activities that is limited. Brown, who bears the burden of proving a substantial burden on the practice of her religion, has not shown that the enforcement of the Ordinance has placed a substantial burden on her right to free exercise of her religion. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *see also Washington v. Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007). In fact, she continues in these activities.

Furthermore, the Ordinance was not designed to favor one religion over another. It is generally applicable, and does not proscribe any particular conduct, whether religiously motivated or not, thus strict scrutiny is not applicable. *See Tenafly*, 309 F.3d at 165. Nor does the law regulate or prohibit conduct because it is undertaken for religious reasons. *See Lukumi*, 508 U.S. at 532. The Ordinance does not discriminate based upon one's religion nor does it refer to any religious

practice in its language or context.  In the application of the Ordinance, the fact that it may have an adverse impact on an individual does not mean there has been impermissible targeting, as where a "social harm may have been a legitimate concern of government for reasons quite apart from discrimination" of the basis of religion.  *Id.* at 535.  The Ordinance is a neutral law of general application, therefore it does not need to be justified by a compelling interest because it is not targeted at religiously motivated conduct nor does it selectively burden religious activity.  *See Id.* at 532-35.

Because Brown has not shown a substantial burden on her exercise of religion and the Ordinance is generally applicable to all conduct, regardless of religion, her claim for relief pursuant to the Free Exercise clause has no merit in this Court's eyes.

4. *Violation of the Pennsylvania Religious Freedom Act Claim*

Brown challenges the Ordinance as being violative of the Pennsylvania RFPA, 71 Pa. Cons. Stat. §§ 2401-2407 (2002), as applied to her.  The RFPA provides that an "agency shall not *substantially burden* a person's free exercise of religion, including any burden which results from a rule of general applicability, unless the agency proves, by a preponderance of the evidence, that the burden (1) [i]n furtherance of a compelling interest of the agency, and is (2) [t]he least restrictive means of furthering the compelling interest."  *Combs v. Homer Ctr. Sch. Dist.*, No. 04-CV-1599, 2005 U.S. Dist. LEXIS 32007, at *30 (W.D. Pa. Dec. 8, 2005) (quoting 71 Pa. Cons. Stat. § 2404).  The RFPA applies "to any State or local law or ordinance and implementation of that law, whether statutory or otherwise."  *Combs*, 2005 U.S. Dist. LEXIS 32007, at *31 (quoting 71 Pa. Cons. Stat. § 2406(a)).  A local law or ordinance will be found to substantially burden a person's free exercise of religion only if it does any of the following:

62

(1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs.

(2) Significantly curtails a person's ability to express adherence to the person's religious faith.

(3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion.

(4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

71 PA. CONS. STAT. § 2403 (2007).

In order to meet the burden of proof required by Section 2404, it is not enough that the challenged action "has some de minimus, tangential or incidental impact or is at odds with their religious beliefs." *Combs*, 2005 U.S. Dist. LEXIS 32007, at *92-93; *see also Levitan v. Ashcroft*, 281 F.3d 1313, 1320-21 (D.C. Cir. 2002) (tangential burden does not equate with a substantial infringement on religious practice). On the contrary, a person asserting a claim pursuant to the RFPA must prove by clear and convincing evidence that his or her free exercise of religion has or will be burdened; only then may a court award such a person injunctive relief. *Combs*, 2005 U.S. Dist. LEXIS 32007, at *31. It is unlikely that a litigant challenging a rule limiting her right to counsel and hand out leaflets, conduct regulated by the law's terms without reference to religion, could satisfy the threshold requirement. *Levitan*, 281 F.3d at 1321.

The Ordinance does not constrain activity or expression required by Brown's religious beliefs. It in no way prohibits or completely bans her ability to convey messages regarding her beliefs on human life. Again, it only seeks to limit the way in which she conveys her message while still permitting signs, handing out literature in accordance within the fifteen foot zone, and the counseling of individuals who give their consent with the 100 foot radius of the eight foot bubble

63

zone.  In order to find that an ordinance violates the RFPA based upon the fact that it constrains or

inhibits conduct or expression, it must *significantly* do so.  The Plaintiff has not shown that this is

the case.  In fact, the Ordinance does not require her to stop her practice of counseling individuals

outside the facilities.  Rather, it reasonably limits the way in which she may do so.  Further, Brown

has not demonstrated any change in her religious practice since the Ordinance went into effect.  In

fact, she has stated that she continues to leaflet and counsel individuals, and by her own admission,

has willing listeners.  (Docket No. 49, at 29 ¶ 51).   The tangential burden on Brown's ability to

protest as well as to provide counsel to individuals does not equate with a substantial infringement

on her religious practice as required by the RFPA.  *See Levitan*, 281 F.3d at 1320-21; *Combs*, 2005

U.S. Dist. LEXIS 32007, at *92-93.   Accordingly, Brown's request for a preliminary injunction

based upon a violation of her rights pursuant to the RFPA fails because she has not met her burden

of proving a substantial burden on her free exercise rights.

> **B.**      **Irreparable Harm**

The Supreme Court has explicitly held that the "loss of First Amendment freedoms for even

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S

347, 373 (1976). "The mere assertion of First Amendment rights, however, does not automatically

require a finding of irreparable injury, thus entitling the plaintiff to a preliminary injunction if [she]

shows a likelihood of success on the merits." *Dowling*, at *10 (citing *Hohe v. Casey*, 868 F.2d 69,

72-73 (3d Cir. 1989)).  The party moving for a preliminary injunction has the burden of showing

irreparable injury.  *Oburn v. Shapp*, 521 F.2d 142, 151 (3d Cir. 1975).

Here, Brown has failed to make a clear showing that she has or will suffer irreparable,

immediate injury if injunctive relief is denied at this stage.  As set forth in *Hohe*, assertion of First

Amendment rights does not automatically require the finding of irreparable harm needed for the issuance of a preliminary injunction. *Hohe*, 868 F.2d at 73. Futher, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm needed for issuance of a preliminary injunction." *Hohe*, 868 F.2d at 73. It is the magnitude of the harm, not the duration, that is decisive. In order to show irreparable harm, Brown must show "a chilling effect on free expression." *Id.* Morever, Brown must show a "direct penalization, as opposed to the incidental inhibition, of First Amendment rights" in order to prove an irreparable injury will occur. *Id.* Brown has failed to make such a showing. In fact, Brown's counsel represented to the Court that she continues in her activities at the facilities, described *supra*. (Trans. I, at 48:1-5; Trans. II, at 67:15-20).

The City Defendants have raised the defense of laches claiming that Brown's six-month delay in filing her preliminary injunction motion negates the presumption of irreparable harm. (Docket No. 35, at 2 n.1). In response, Brown argues that she has timely filed her motion and the delay in filing the motion does not amount to inexcusable delay. (Docket No. 40, at 1). She further argues that the City Defendants were not prejudiced by the delay, thus the defense of laches fails. *Id.*

The defense of laches consists of two essential elements: (1) inexcusable delay in filing suit; and (2) prejudice resulting to the defendant from such delay. *Univ. of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982); *Villanova Univ. v. Villanova Alumni Educ. Found.*, 123 F.Supp.2d 293, 306 (E.D. Pa. 2000); and *FMC Corp. v. Control Solutions, Inc.*, 369 F.Supp.2d 539, 582 (E.D. Pa. 2005) (citations omitted). An unreasonable delay in seeking an injunction negates the presumption of irreparable harm. *FMC*, 369 F.Supp.2d at 582. The relevant inquiry is "whether the movant is in danger of suffering irreparable harm at the time the preliminary

injunction is to be issued." *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985).

The Ordinance was enacted in December of 2005. The first incident of enforcement, of which Brown complains, did not occur until January 28, 2006. Brown also alleged, without providing specific dates, additional enforcement events that occurred after the Ordinance was passed. Furthermore, Brown attended the public hearings held by the Pittsburgh City Council regarding the Ordinance on December 7, 2005 and December 13, 2005. (Trans. II, at 29:1-11, 30:15-16). Brown had notice of the Ordinance after it went into effect in December of 2005. The present action was initiated on March 27, 2006, three months later. Moreover, she did not file her request for injunctive relief until June 28, 2006, following an additional three month period. Plaintiff's counsel has represented that Brown has to this day continued in her protests. (Trans. I, at 48:1-5, Trans. II, at 67:15-20).

As discussed herein, at best Brown has only shown an incidental impact on her First Amendment rights. She has cited to two past events, both of which are disputed, for which she claims irreparable harm. In this Court's estimation, she has made no credible showing that any future constitutional harm is likely to occur. In order to support a request for injunctive relief, Brown cannot solely rely on past injury to meet her burden, but must prove a likelihood of future harm as the Ordinance is applied to her. *See City of L. A. v. Lyons*, 461 U.S. 95, 105-06 (1983). Therefore, Brown has not proven by clear and convincing evidence that she will suffer irreparable harm if injunctive relief is denied.

### C. Greater Harm to Nonmoving Party by Granting Relief

66

Brown asserts that awarding her injunctive relief would not harm Defendants because they "already permit speech concerning other topics in the same public way and sidewalks" that Brown seeks to access. (Docket No. 23, at 29).

However, this Courts finds that granting such relief would clearly result in greater harm to the City Defendants. By requiring the City Defendants to enforce the Ordinance against all other members of the public except for Brown would indeed potentially harm the CityDefendants and its stated goals for the Ordinance. The City Defendants enacted the Ordinance to remedy the following concerns: violent confrontations at the downtown health facilities, issues relating to public sidewalks, inefficiency in the deployment of municipal police officers, and lack of certainty by citizens and police officers as to proper behavior. (Docket No. 49, at 2 ¶ 5). As discussed *supra*, the Ordinance was designed to promote the public safety of individuals entering and leaving health care facilities and protestors. Exempting Brown from the restrictions of the Ordinance is contrary to the Defendants' compelling interests and would significantly hinder the efforts behind the enactment of the Ordinance. Allowing only Brown to cross the buffer zone lines would cause serious problems between the other protestors, the health facilities, and the City of Pittsburgh. It would undercut the very efficiency and consistency the Ordinance seeks to achieve. Hence, granting Brown such extraordinary relief would result in greater harm to the Defendants.

## D.     Public Interest

It is always in the public interest to prevent the violation of a party's constitutional rights. *See G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6[h] Cir. 1994).

However, Brown has not shown that her constitutional rights have been violated to this point. To enjoin the enforcement of the Ordinance would diminish the efforts of the City in

reaching its stated goals of ensuring public safety by maintaining the safe and unimpeded access to health care facilities. To that end, it "frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted). Furthermore, an injunction is an equitable remedy "which should not be lightly indulged in" and "only granted in a clear and plain case." *Plain Dealer Publishing Co. v. Cleveland Type, Union # 53*, 520 F.2d 1220, 1230 (6th Cir. 1975), *cert. denied*, 428 U.S. 909 (1977). Brown has failed to make a clear showing that such extraordinary relief is warranted.

## IX. Conclusion

For the foregoing reasons, the Court finds that the Ordinance is a facially constitutional regulation of the time, place, and manner of protected speech, according to the Supreme Court's holding in *Hill v. Colorado*. The Court also finds that the terms of the Ordinance are not unconstitutionally vague on their face or as applied to Brown nor are they overbroad. Brown's as-applied challenge to the Ordinance fails because she has not proven an established invidious custom, policy or practice on the part of the City of Pittsburgh and its police officers. The enforcement of the Ordinance against Brown does not substantially burden her right to free exercise of her religion. In fact, she continues in her activities to this day. Moreover, this Court finds that the Ordinance is generally applicable to all conduct outside the subject facilities, regardless of religion. Brown's claim under the Pennsylvania Religious Freedom Protection Act also fails because she has not met her burden of proving a substantial burden on her free exercise rights as required under said Act. Brown has not shown that she has or will suffer irreparable injury by the denial of relief because she not proven any direct constitutional harm to her rights.

Accordingly, upon consideration of the Plaintiff's Motion For Preliminary Injunction [DE 22], the City Defendants' response thereto [DE 35], the transcript of the evidentiary hearing held on September 21, 2006, the Plaintiff's Exhibits in Support of her Motion for Preliminary Injunction, the Plaintiff's Proposed Findings of Fact and Conclusions of Law [DEs 50 & 52], the City Defendants' Proposed Findings of Fact and Conclusions of Law [DEs 49 & 51], the transcripts of the City Council meetings leading to the passage of the challenged ordinance, the Plaintiff's Supplemental Authorities [DE 64], the Defendants' response thereto [DE 65], the transcript of the oral arguments heard on December 19, 2007, as well as the entire record in this matter, IT IS HEREBY ORDERED that the Plaintiff's Motion for Preliminary Injunction [DE 22] is **DENIED**. An appropriate order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: February 22, 2008

cc/ecf: All counsel of record

69